## CALDWELL v. HICKS et al.
### No. 304.

District Court, S. D. Georgia,
Savannah Division.

March 26, 1936.

Anderson, Cann & Dunn, of Savannah, Ga., and Bond, Fuqua & Bond, of Nashville, Tenn., for plaintiff.

Adams, Adams & Douglas, of Savannah, Ga., and Pitts, McConnico, Hatcher & Waller, of Nashville, Tenn., for defendants.

BARRETT, District Judge.

The branch of the above case under consideration involves merely these questions: (1) Is Rogers Caldwell, as trustee, under the deed of trust from Ralph F. Hicks, John Wesley Hotel owner, entitled to a fee; and, if so, what is the amount thereof; and, further, is he liable for the loss of $7,652.87, which was on deposit in the Bank of Tennessee at the time of its failure; and, if liable, should this amount be offset against any fee allowed? And (2) what amount of fees are counsel for Rogers Caldwell, as trustee, entitled to, both for representing him in the state courts of Georgia in resisting an effort to remove him as trustee and in the foreclosure of the said deed of trust?

The deed of trust contains the following provision: "Caldwell & Company shall thereupon deposit all of said payments in such bank as may be selected by the Trustee and shall furnish the Owner with duplicate deposit tickets or slips showing all such deposits." A like provision covered other amounts to be deposited. Caldwell selected the Bank of Tennessee as the bank where all deposits were to be made,

and such deposits were made to the sinking fund account of the John Wesley Hotel.

Said deed of trust contained this provision, in the event of the sale of the property the proceeds will be applied by the trustee: "First. To pay all reasonable costs and charges of executing and administering this trust, including reasonable attorney's fees and expense of any litigation which may arise on account of the execution and enforcement of this trust, or incident to the administration thereof, or the protection of the property covered by this deed, or the rights of the Trustee or Bondholders therein."

Further: "Should any suit or other proceedings be brought against the Trustee by reason of any matter or thing connected with the trust hereby created, not the fault of the Trustee, or by reason of being such Trustee, the costs and expenses of defending the same by said Trustee, including reasonable counsel's fees, and his compensation, shall be paid by the owner and shall be a first lien upon the trust property, and shall be paid and compensated for out of the said trust property."

Further: The trustee shall not be responsible "for any other costs, matter or thing except his own breach of the trust herein expressed."

And again: Such trustee "shall not be in any wise liable for any act or thing hereunder except his own gross negligence, or the gross negligence of the agents or attorneys appointed by him in carrying out the provisions of this trust deed."

Further: "The Trustee has been compensated for all services which he may be called upon to perform in the execution of this trust to the termination thereof, exclusive of any compensation he may hereafter find it necessary to pay attorneys, provided no defaults made by the Owner in the performance of any of the obligations imposed upon it hereunder, or under said bonds and coupons; but in the event of such default, or the performance of any of the obligations imposed upon it hereunder, or under said bonds and coupons, but in the event of such default, or the performance of further duties made necessary by such default, such Trustee shall receive a reasonable compensation for any duties that he may, at any time, perform, in the discharge of the same, and reimbursement for all legitimate expenses, including counsel fees, incurred by him,

and all such fees, commissions and disbursements, shall constitute a first lien on the property and premises, and upon all sums in his hands held hereunder."

During the existence of the trust and before any default on the part of the debtor Caldwell & Co., or Rogers Caldwell, did some financing, but all the advances then made had been repaid before default occurred leading to the foreclosure.

The affairs of Caldwell & Co. were taken over by a committee on November 6, 1930, and their failure followed on November 13, 1930. The affairs of the Bank of Tennessee were taken over and the bank closed on November 7, 1930.

Subsequent to the failure of Caldwell & Co. and the Bank of Tennessee, there was a default by the debtor in the payment of interest on April 1, 1931, and there were other defaults under the deed of trust.

The bondholders' committee consisting of prominent business men, the personnel of which was certainly acquiesced in by Caldwell, was created for the purpose of looking after the affairs of this property. There were on deposit with this committee at the time of the foreclosure 92 per cent. of the outstanding bonds. The property was managed for a while by agreement of parties at interest, · Caldwell acquiescing therein. There was no action taken by the owners or holders of any of the bonds except those represented by the committee. Friction arose between Caldwell and the committee the latter part of 1932 and the early part of 1933. In 1933 the bondholders' committee instituted proceedings in the superior court of Chatham county, Ga., where the John Wesley Hotel is located, to remove Caldwell as trustee. This effort was contested and finally determined by the Supreme Court of Georgia on September 15, 1934, Caldwell v. Hill, 179 Ga. 417, 176 S.E. 381, 98 A.L.R. 1124, deciding that the state court had no jurisdiction in the premises. The question of jurisdiction was the only one which was decided in such litigation.

While such suit was pending in the state court, foreclosure proceedings were begun in this court by said Caldwell, as trustee. No question was raised as to the validity of the deed of trust, the default of the debtor, or the right to foreclose after the effort to remove Caldwell as trustee had failed. By agreement of parties, proceedings in this court awaited the decision of the state court. Thereafter there

was no contest in the matter of the foreclosure and sale except the differences involved in this decision as stated above.

The property brought a price that will result in the payment of approximately 50 per cent. principal of the bonds, no interest having been paid thereon since October, 1930.

Rogers Caldwell owned the entire capital stock of Caldwell & Co. Caldwell & Co. owned the entire capital stock of the Bank of Tennessee. Caldwell was president of both institutions, and the boards of directors were either exactly or substantially the same. The relationship of Caldwell to Caldwell & Co. and through that company to the Bank of Tennessee was such as to make the Bank of Tennessee a mere auxiliary of Caldwell & Co., amounting to practically nothing more in substance, even though nominally different, than a department of Caldwell & Co. The intimacy of this relationship and the substantial, if not nominal, identity of these two institutions, not only with each other but with Caldwell individually so far as the control of the affairs of the two and so far as the performance of Caldwell's duty as trustee, is shown by the following testimony from Caldwell in the examination before this court, coupled with other testimony disclosing details in the conduct of the business of Caldwell & Co.:

"By the Court: Let me see if I understand, there is no dispute that he (Caldwell) was president of both institutions, Caldwell & Company and the Bank, and that he owned all the stock in the Company and that the company owned all of the stock of the bank, and therefore so far as the actual disposition of this money was concerned it was just as much in his hands as if it was deposited with him individually; if I understand, he ran the whole business, is that right?

"Mr. Caldwell: Well, yes sir.

"By the Court: And it was just as much under your control as if it was in your hands individually?

"Mr. Caldwell: Yes sir, in a way.

"By the Court: Is not that true?

"Mr. Caldwell: Well, yes sir."

There is other testimony similar in nature, but it is not deemed necessary to make further quotation.

It is not deemed necessary or appropriate to undertake the investigation and analysis of the very intricate and stupendous affairs of Caldwell & Co. and the Bank of Tennessee in order to determine the issues involved in this cause. The following testimony is, however, illuminating as to the knowledge of Caldwell of the affairs of Caldwell & Co. and of the Bank of Tennessee in connection with his duty as trustee in the premises. It is true that in June, 1930, the Banco Kentucky acquired half of the outstanding stock of Caldwell & Co., but this did not alter so far as has been disclosed the powers of management still resting with Caldwell. He still continued up to the time of the failures as president of Caldwell & Co. and also president of the Bank of Tennessee. The first piece of testimony in order of time is a memorandum under date of February 6, 1930, addressed by Eddie Goodloe, cashier of Bank of Tennessee, to Caldwell and two associates, Mr. Heitzeberg and Mr. Carter, and the second is a confidential communication under date of March 18, 1930, to the same parties.

The memorandum of February 6, 1930, is as follows:

"With approximately $14,000,000.00 of deposits in Caldwell & Company and Bank of Tennessee we should anticipate at least a 1% withdrawal. This obviously amounts to $140,000.00 per day. Shipments are not averaging $40,000.00 per day (this excludes, of course, syndicate pickup and other items for which we disburse cash at the same time we realize on same).

"This differential of $100,000.00 daily must be met in one of two ways, namely, by securing additional *cash* deposits or through loans (including repurchase agreements, etc.).

"It has been practically impossible to borrow from the money centres (New York, Chicago, etc.) on anything other than Municipal bonds of larger cities and municipalities. With our very limited supply of such collateral we have been extremely pushed to satisfy the wishes of such banks Chase National, Chemical Bank & Trust Company, Equitable Trust Company and others. With such large loans with these banks it is absolutely impossible to pledge *solely* municipal bonds of any type much less of larger cities and counties.

"We are in some instances permitted to use on the above loans a few selected stocks at an attractive margin including Missouri State Life, Union Planters National Bank and Fourth & First stocks.

We have pledged in each case as much of such stocks as the bankers will take.

"The main point I wish to stress in this memorandum, however, is the matter of bank balances. In spite of the fact that we are pledging high grade collateral on wide margins our correspondents, without exception, expect and are demanding that we keep a 20% supporting balance against our borrowings. This has been impossible, our bank balances being ridiculously small in comparison with our borrowing.

"Our inability to keep these balances up is forcing us into an unfavorable light in the eyes of our bankers. My greatest concern is that, due to our inability to keep balances considered satisfactory to our correspondents, they may either call our demand loans or refuse to renew our time loans.

"The lack of cash funds at present cannot be laid to the fact that we utilized too great an amount of the $2,000,000.00 of State money to pay off loans rather than use same to increase cash balances. We have reborrowed practically all sums paid off with this deposit.

"I enumerate a few of the major disbursements which have offset our recent deposit accruals.

| | |
|---|---:|
| Shares in the South........ | $ 525,000.00 |
| Insurance Securities Co..... | 545,000.00 |
| Missouri State Life Withdrawals ................. | 500,000.00 |
| Other deposit withdrawals in Jan. ................... | 1,000,000.00 |
| | $2,570,000.00 |

"I commend the above matters to your attention with the request that you please give mature thought to improving our cash position which in addition to alleviating above conditions will automatically enable us to correct well-known evils unavoidably existing in our Trust Accounts."

The confidential communication of March 18, 1930, is as follows:

"For some time I have wished to give you three a graphic picture of a few irregular transactions which for reasons that can be more readily orally explained exist in our Securities Department. No one realizes that such things ought not to exist more than the writer. The habits responsible for the condition were begun years ago and have been given official sanction by you. By this statement I mean that the condition has been known and in many cases initiated by you and, being known, I have assumed that you would at the earliest possible time take steps toward its correction. In each case I have considered that such action was a sort of temporary or emergency procedure. This being the case, I have tried my best to improve the conditions but when some progress has been made a deal will be concluded under circumstances requiring irregular action which reinstates the same old condition.

"With official sanction given for such irregularities improvement of the conditions will be impossible until concerted action is taken by you three towards its immediate cessation. There must be a unanimous determination on the part of you three towards helping the writer in two main points, namely, (1) Improve our cash position, and (2) make some arrangements for having on hand daily at least $100,000.00 par amount of municipal bonds for 'swapping' purposes. Of course I realize that the solution of (1) will automatically take care of (2). We have not been able for weeks to fill an order for five or ten bonds without having to make a payment on a loan to do so.

"I would further discuss at length the difficulties we have in utilizing corporation and mortgage bonds and most all stocks for collateral purposes but I believe you are familiar with this phase.

"The items referred to in the opening paragraph and which I wish to bring to your attention are:

"(1) *East Jefferson Louisiana Bonds.*

"We have never paid for these bonds yet we are using for collateral purposes $950,000.00 par amount. We have $200,000-00 unpledged and $100,000.00 on Bank of Tennessee Trusts. When finally to be paid for we shall have to draw down $625,000.00. Assuming we can get hold of the above $300,000.00 worth without payment we will still have to pay about another $300,000.00 to obtain the balance.

"(2) *Charlottesville (Virginia) National Bank & Trust Company.*

"We are supposed to have $250,000.00 State of Tennessee bonds securing this Trust. We have no collateral at all securing same.

"(3) *Guaranty Bank & Trust Company, Alexandria, Louisiana.*

"We are supposed to have municipal bonds satisfactory to Canal Bank & Trust

Company on this trust. We have Inter-Southern stock and Tennessee Products common stock.

"(4) *Owensboro, Kentucky Trust.*

"The Southern Security Company has underwritten the bond on this deposit and we are required to inform them on demand of collateral security. We report a list of collateral we do not have pledged.

"(5) *Sundry Failures to Notify Authorities of Collateral Substitutions.*

"I consider this a less urgent point although steps should be taken to correct the condition. The monthly 'Trust Report' shows wherein the above sundry Trusts are not in line with the Trust Agreements.

"(6) *Hypothecation of Customers' Collateral.*

"This procedure was never adopted until some six months ago. With the adjustment of the Fourth & First National Bank stock the greater part of this evil has been corrected. We still have about 4,000 shares of Missouri State Life belonging to customers hypothecated.

"If it is the determination of you three (and I cannot too strongly urge that it be) to live up to the letter of the Trust Agreements the matter could automatically be settled (insofar as future transactions are concerned) by in all cases making the Fourth & First National Bank Trustee instead of the Bank of Tennessee or Caldwell & Company. Of course I realize that we have all fallen into the idea that to have the Bank of Tennessee as Trustee is to our advantage. It really is but just where to draw the line on 'satisfactory to Trustee' collateral is a moot question.

"In this connection the Municipal Buying Department should be emphatically told that both Caldwell & Company and Bank of Tennessee will hereafter live up strictly to the wording of the Trust Agreements. Colonel Alexander, Mr. Wentworth Caldwell and Mr. Voss should be informed of your determination. In making agreements in which Bank of Tennessee or Caldwell & Company act as Trustee they invariably consider such deposits as free. They always have done so and should be properly instructed by you three otherwise.

"I have endeavored in every way possible to work for the best interests of Caldwell & Company and have with much misgivings signed agreements of the above mentioned type only because I knew they were officially sanctioned. I gladly join in a determination to correct any and all of the above evils".

It was further in evidence that almost the entire business of the Bank of Tennessee consisted in its purchase of securities underwritten and floated by Caldwell & Co., under an agreement with Caldwell & Co. that any of such securities so bought by the Bank of Tennessee would be repurchased by Caldwell & Co. upon demand at the price at which they had been purchased.

It is true, however, that there is testimony that even after the affairs of Caldwell & Co. had been put in the hands of the committee there was a report of such committee that Caldwell & Co. was then solvent. However, the realization resulted in the creditors of Caldwell & Co. receiving approximately one-half a cent on the dollar and the unsecured creditors of the Bank of Tennessee received nothing.

Significant is the following testimony: The sworn tax schedules of Caldwell & Co. and the Bank of Tennessee as of February 27, 1930, showing that the capital stock of Caldwell & Co. of $1,000,000 had a capital deficit of $725,300.79, leaving its net worth at $274,699.21; and that the capital stock of $500,000 of the Bank of Tennessee had a capital deficit of $84,217.59, showing a net worth of $415,782.41. Included in the assets of the Bank of Tennessee was real estate known as Brentwood Hall, carried at $463,809.16. It developed that the title to the land was not in Rogers Caldwell, but was in his father, who about the time of the failure deeded the property to a trustee for Rogers Caldwell and his unborn children. This asset was then taken out of the Bank of Tennessee, and there was substituted therefor a charge against Caldwell & Co. in excess of $400,000, which is in excess of the sworn net worth of Caldwell & Co. as of February 27, 1930.

About June 1, 1930, Caldwell & Co. declared a dividend to its sole stockholder, Rogers Caldwell, of approximately $1,200,-000. The testimony was that in order to show the warrant for such a dividend the values of the property were marked up on the books.

On October 3, 1930, the Bank of Tennessee paid to the Chemical National Bank & Trust Company of New York for bonds

and coupons due $528, and on November 6, 1930, made a like payment of $4,938.50.

### Findings of Fact.

1. Dealing with the substance and not with mere names, the Bank of Tennessee was, as related to the trust herein involved, the same as Rogers Caldwell. Such bank was in substance no more than a department of Caldwell & Co., whose entire stock was until only a very short time before the failure wholly the property of Rogers Caldwell. The creation and use of the bank were to aid in carrying on the business of Caldwell & Co. As stated by Caldwell, the scheme was the opposite of that which prevailed for some time, where a bank owned entirely its investment company, because in his case the investment company owned entirely its bank. The former scheme no more justified disrepute and bitter criticism than did the latter, if as much. The designation by Caldwell of the Bank of Tennessee as the depository of the trust funds was in substance designating himself.

2. The testimony justifies the conclusion that the Bank of Tennessee was insolvent for some time before it was closed and that Rogers Caldwell knew it; but it is unnecessary to decide this. Rogers Caldwell certainly knew some time before the bank was closed that there was danger of the loss of the trust funds, held by him as trustee, if they were continued on deposit in such bank, and his failure to remove such funds was gross negligence.

3. The language of the deed of trust as quoted above relative to deposits meant general deposits rather than special deposits. This conclusion is despite the decision in the case of Genesee Wesleyan Seminary v. United States Fidelity & Guaranty Company, 247 N.Y. 52, 159 N.E. 720, 56 A.L.R. 964. But it did not mean a bank which was so related to the trustee, as in this case, and such provision was no authority to designate the Bank of Tennessee as the depository.

4. The action of Caldwell in designating the Bank of Tennessee as the depository and in failing to withdraw all trust funds before the bank closed was gross negligence.

5. The deposit of such trust funds in the Bank of Tennessee resulted in benefit to the trustee individually.

6. The trustee was justified in resisting in the state courts the effort to remove him. Had he not resisted, and if a judgment of removal had been obtained without service on him, doubt might have existed as to the efficacy of such judgment and therefore as to the title of a successor trustee. He could have appealed and cured this defect; but it was his right to challenge the jurisdiction, as he did. His counsel fees are entitled to payment out of the funds in court.

7. Aside from the questions here dealt with, there were no contests as to the foreclosure. It was largely formal and followed well-known paths of procedure.

8. The property brought at foreclosure $66,800. The outstanding bonds amount to the principal sum of $158,000 with interest from October 1, 1930, at 7 per cent. per annum. Funds arising from the operation of the hotel amounting to approximately $10,000 are subject to distribution in this proceeding.

9. Fees otherwise payable to the trustee having been held to have been forfeited, it is inappropriate to fix what they might have been. Even if not forfeited, they would be much less than the amount of the loss caused this estate by the gross misconduct of the trustee, $7,652.87, which loss could be offset against such fee if allowed.

10. In determining the fees of counsel for the trustee, I have not considered the services rendered in connection with the litigation in this cause over the right of the trustee to fees and the question of offset, as that was a litigation personal to the trustee. I have considered the services rendered in the state courts and in the uncontested foreclosure.

Entertaining the very highest regard for the abilities, experience, and character of the two distinguished lawyers whose expert opinions as to fees were submitted to the court, I nevertheless cannot agree with them. I have concluded that a proper fee for the services entitled to be paid out of the fund in court is $4,500, and I so find.

### Conclusions of Law.

1. "Trustees cannot make a profit from the trust fund committed to them, by using the money in any kind of trade or speculation, nor in their own business." Perry on Trusts & Trustees (7th Ed.) § 429.

2. "It is the duty of the trustee to withdraw the money from the bank upon

the slightest indication of danger." Perry on Trusts & Trustees (7th Ed.) § 443.

3. "Want of fidelity forfeits a trustee's right to compensation on obvious principles of justice. Hence, if the trustee is dishonest, or unfaithful, or negligent, or reckless in the performance of the duties of the trust no compensation will be allowed." 26 R.C.L. p. 1393, § 359. See, also, 65 C.J. p. 929, § 840.

4. "If a trustee mingles trust funds with his own, and the mingling is followed by loss, accidentally or otherwise, he must make it good. 3 Pomeroy's Eq. (4th Ed.) 1079; 26 R.C.L. 1322." Strauss v. United States Fidelity & Guaranty Co. (C.C.A.) 63 F.(2d) 174, 177.

5. If fees be not forfeitable under the facts of this case they are subject to be offset by the loss caused this estate by the gross negligence of the trustee.

Let a decree be presented in accordance with these findings.