**UNITED THACKER COAL CO. v. PEYTONA LUMBER CO. et al.**

**No. 3022.**

District Court, S. D. West Virginia.

May 28, 1936.

F. M. Livezey, of Huntington, W. Va. (B. C. Tynes, of Huntington, W. Va., on the brief), for petitioner.

J. M. Woods, of Charleston, W. Va., and Joseph H. Head, of Cincinnati, Ohio, for respondent.

NORTHCOTT, Circuit Judge (sitting by designation as District Judge).

In November, 1934, the plaintiff in this suit filed its bill of complaint against the Peytona Lumber Company, a West Virginia corporation, and other defendants, including the Fifth-Third Union Trust Company, a banking corporation, doing business in the city of Cincinnati, Ohio, herein referred to as the Trust Company. The defendant company, herein referred to as the Lumber Company, had been engaged in cutting timber and operating a lumber plant at Omar, in Logan county, W. Va., and selling its product. It had purchased the timber, which it cut and manufactured into lumber, from the plaintiff, herein referred to as the Coal Company, under a deed and agreement filed as an exhibit with the bill of complaint of the original suit. The Coal Company claimed that the Lumber Company was indebted to it in a large sum and alleged that the Lumber Company was wholly insolvent. We are not concerned with the various allegations in the bill in the main suit other than to note that the claim of the plaintiff as to its debt is contested.

On November 28, 1934, United States District Judge McClintic appointed B. L. Kidd and Finley Cook as receivers for the Lumber Company with authority to collect all sums of money owing to the Lumber Company and to institute and prosecute such suits as, in the judgment of such receivers, might be necessary for the protection of the assets of the company.

On the 18th day of April, 1935, the receivers, by leave of court, filed a petition against the Trust Company praying that the Trust Company be required to refund and repay to the receivers the sum of $27,944.98, as the aggregate amount of principal and interest which the Lumber Company had paid to the Trust Company on account of the purchase of 1,000 shares of no-par value stock of the Lumber Company, with interest thereon from the dates of payment, and further praying that the Trust Company should be required to surrender for cancellation the notes of the Lumber Company, held by it, aggregating in principal amount the sum of $28,500, evidencing the remainder of the purchase price of said stock. An order was entered on the 18th day of April, 1935, filing said petition and directing the Trust Company to show cause why an order should not be made directing it to comply with the prayer of said petition. Service of a copy of the petition was accepted by counsel for the Trust Company, which filed a motion to dismiss said petition and in the alternative to strike out part of the same. After argument, the court on June 3, 1935, overruled this motion.

In December, 1935, evidence was taken both on behalf of the receivers and the Trust Company. Later briefs were filed, and after oral argument the cause submitted.

The transaction of which the receivers complain in their petition arose as follows: On or before June 11, 1928, one Fred C. Prichard, then engaged in the banking business in Huntington, W. Va., was indebted to the Trust Company in the sum of $50,000, for which debt the Trust Company held a note of said Prichard, which note was secured by 1,000 shares of stock of the Lumber Company then having a par

value of $100 per share. This note of Prichard's was finally put in the form of a collateral demand note, and on October 11, 1928, the Trust Company took from Prichard an assignment of the dividends on the stock in the Lumber Company which it held as collateral. About this time Prichard became financially involved, surrendered his holdings in West Virginia, and moved to Texas. Whether Prichard was insolvent at that time or not, he shortly became insolvent, and, evidently realizing Prichard's involved condition, the Trust Company from that time on took the attitude that it was practically the owner of the stock; this was shown by the correspondence introduced. In one letter written November 10, 1928, one Goble, vice president of the Trust Company, writing to Mahan, president of the Lumber Company, refers to "our connection with your Company through a loan on a large portion of the stock," and in a letter of February 1, 1929, Goble wrote to Mahan as follows:

"I am just wondering whether it would not be a good idea for us to have this stock issued in the name of some of our people as Trustee, so we will receive notices of the meetings of the Company, also if we should not have some one representing us on the Board of Directors of the Company. These thoughts come to me on account of our large indirect interest in the welfare and success of the Company.

"Where is Fred Prichard now? Is he still living in Huntington, or has he gone to Texas as he told me he was contemplating? What is the present situation of his health and as to his finances? I am hoping they are not in as bad a shape as he seemed to think when I was last talking to him."

On February 11, 1929, Goble wrote Mahan requesting specific, detailed information with respect to the Lumber Company's audit of December 31, 1928.

In 1929 the Lumber Company changed its certificates of stock from shares of $100 par value for an equal number of no-par value shares of stock, and on September 9, 1929, in a letter forwarding the new certificate to the Trust Company, also asked the bank to handle a loan of $5,000 for the Lumber Company; this request was denied by the Trust Company on the ground that the Lumber Company was not a regular customer and that the banking situation was such that the Trust Company was only taking care of its regular customers.

About this time the Lumber Company began to become involved and ceased paying dividends, and on December 2, 1930, Goble wrote Mahan, making inquiry as to conditions in the lumber business and as to the probability of the Lumber Company paying a dividend any time in the near future. Correspondence between Goble and Mahan in the early part of 1931 shows that Goble was again making requests for detailed information with regard to the statement of the Lumber Company of December 31, 1930, and in a letter dated February 11, 1931, to Mahan, Goble uses the following language: "I am sure you know what I am trying to arrive at and you may add to the questions above with some other information that you can give me, so I will know how to figure on this properly. As you know, we have a large investment and our people are continually asking me how it is going to come out, etc., and I want to be in position to advise them properly as to the status of the investment."

On February 2, 1931, one Nagel, an officer of the Trust Company, wrote to Prichard in Texas calling on him for the payment of $1,211.09, for interest due on Prichard's loan, Prichard evidently having defaulted in the payments when the dividends of the Lumber Company ceased carrying the interest. On February 9, 1931, Nagel notified Prichard that the Trust Company would have to sell the stock held as collateral for the debt. In response to this, Prichard asked Nagel to wait a few days until Mahan could talk the matter over with Goble, and Mahan requested Goble to hold the matter up until he could go to Texas and see Prichard. Mahan went to Texas, and on his return stopped in Cincinnati to see Goble, and on March 10, 1931, an agreement was entered into between Mahan and the Trust Company by which the Lumber Company purchased the stock in the hands of the Trust Company, borrowing the money from the Trust Company to make the purchase. This agreement reads as follows:

"Cincinnati, Ohio.
"March 10, 1931

"Received from The Fifth Third Union Trust Company, Cincinnati, Ohio, one thousand (1,000) shares of stock of the Peytona Lumber Company, covered by certificate No. 52, in the name of Fred C. Prichard, for which we are paying said

bank $42,319.97, which stock they are selling to the Peytona Lumber Company under clause mentioned in the demand note reading as follows:

" 'The undersigned also gives to the holder or holders hereof full power and authority to collect at the expense of the undersigned or to sell, assign and deliver the whole, or any part of said property, or any substitute therefore, or any additions thereto, either in Cincinnati, Ohio, or elsewhere, at public auction or private sale, at the option of said holder or holders hereof or their assigns, on the nonperformance of any of the conditions of this obligation or promise, or the non-payment of the liabilities above mentioned, or at any time or times thereafter, without advertising the same or giving the undersigned any notice.'

"We also acknowledge receipt of the demand note mentioned dated October 11, 1928, secured as follows:

" '$50,000.00 note of Fred C. Prichard due Oct. 11th, 1928, together with 1000 shares stock Peytona Lumber Company pledged as collateral thereto.'

"Also note of Fred C. Prichard dated June 11, 1928, due on Oct. 11, 1928, collateral to the first mentioned note.

"We are buying this stock of our company with the intention of retiring it. The Peytona Lumber Company and E. K. Mahan individually hereby guarantee The Fifth Third Union Trust Company that there will be no claim against the said Fifth Third Union Trust Company by Fred C. Prichard or others, arising from this sale.

"Peytona Lumber Company
"By E. K. Mahan
"President
"E. K. Mahan."

Out of the proceeds of the $50,000 borrowed from the Trust Company by the Lumber Company, there was paid the Prichard debt to the Trust Company, with interest due, amounting to $42,319.97, and the remainder was applied to the purchase, through the Trust Company, of Liberty bonds to the par value of $7,550, which were forwarded to Prichard in Texas.

On its note of $50,000, the Lumber Company paid various sums, and at the time of the receivership the debt had been reduced to $28,500, for which the Trust Company held the note of the Lumber Company.

It is contended on behalf of the receivers that this purchase of 1,000 shares of stock was contrary to the West Virginia statute, and for that reason was void; that it impaired the capital of the Lumber Company and was in fraud of the creditors of the Lumber Company, for the reason that the Trust Company was in effect the owner of the stock and stood in the shoes of a stockholder; that the Trust Company was the beneficiary of the payments made to it in contravention of the rights of the creditors of the Lumber Company; and that the Trust Company should be required to repay to the receivers the money it received from the sale of the stock and be compelled to cancel the notes that it holds against the Lumber Company.

It is contended on behalf of the Trust Company that it was in no sense a stockholder of the Lumber Company; that the plaintiff in the original suit is not a creditor of the Lumber Company, but is indebted to it; that purchase of the stock in question did not impair the capital of the Lumber Company to any appreciable extent, if at all; that, if it did impair the capital of the Lumber Company, the Trust Company had no knowledge of that fact, and cannot be charged with such knowledge; that, by reason of its limited participation in the transaction, the Trust Company cannot be subjected to any liability in connection with it; and that the only creditors who might complain of the transaction have, with the knowledge thereof, acquiesced in the same for a long period of time, and this action cannot now be maintained for their benefit because of the fact that their acquiescence and laches estopped them from questioning the transaction.

The pertinent part of the West Virginia statute relied upon on behalf of the receivers as prohibiting a West Virginia corporation's purchase of its own stock when such purchase would cause any impairment of its capital is found in section 39, art. 1, c. 31, Code of West Virginia (effective as of January 1, 1931), which provides in part as follows: "Every corporation organized under this chapter, or existing under the laws of this State, shall have the power to purchase, hold, sell and transfer shares of its own capital stock: Provided, That no such corporation shall use its funds or property for the purchase of its own shares of capital stock when such use would cause any impairment of the capital of the corporation."

■ In considering the validity of the transaction of March 10, 1931, when the Trust Company lent the Lumber Company, with Mahan as indorser, $50,000, knowing, as the Trust Company admittedly did, that the money was to be used for the purchase and retirement of the Lumber Company's own stock, it is necessary to consider the situation as it was at the time of the transaction as well as view the events leading up to it. The Trust Company had lent Prichard a large sum of money, and the only security that it held for the loan was the stock of the Lumber Company, owned by Prichard. Prichard had become insolvent, and the Trust Company knew of his insolvency for several years prior to the transaction of March 10, 1931, and the Trust Company also knew that the only source from which it could collect the debt that Prichard owed it was the Lumber Company stock. The Prichard debt to the Trust Company was in existence as far back as the year 1928. The dividends paid by the Lumber Company were, for several years, sufficient to pay the interest on the loan and apparently make some deduction in the principal. When Prichard surrendered all of his interest in West Virginia and moved to Texas, the Trust Company assumed the role of owner of the stock, requesting detailed information from the Lumber Company as to its annual statements, and going so far as to ask that it be given representation on the board of directors of the Lumber Company. In the correspondence Goble, vice president of the Trust Company, refers to the "investment" of the Trust Company in the Lumber Company, and in other ways manifested a lively and perfectly proper interest in the affairs of the Lumber Company. From these circumstances the conclusion is inevitable that the Trust Company stood in the relationship, for all practical purposes, of a stockholder in the Lumber Company rather than a holder of pledged stock, even though the stock was nominally in the name of Prichard. This conclusion is reached because equity looks through form to substance, and in substance the Trust Company owned the stock. Its interest had become identical with the interest of the other stockholders.

■ The question then to be considered is whether the transaction of March 10, 1931, entered into by the Trust Company, knowing that the stock purchased by the Lumber Company was to be retired, was in violation of the West Virginia law. The Trust Company is charged with the knowledge of the law governing a corporation in the state in which it is incorporated, and therefore knew that, if the purchase of the stock impaired the capital of the corporation, it was in violation of the statute and ultra vires. In re International Radiator Co., 10 Del.Ch. 358, 29 A. 255; McCormick v. Market National Bank, 165 U.S. 538, 17 S.Ct. 433, 41 L.Ed. 817; 3 Thompson on Corporation, § 1795.

■ In transactions of this character it is not necessary to quote authorities to the effect that the Trust Company, in dealing with the Lumber Company, under the admitted circumstances of the case, did so at its peril and that the Trust Company is chargeable, not only with such knowledge as it actually had, but is also chargeable with the knowledge that it should have acquired by inquiry. In fact, the evidence shows that the Trust Company did make inquiry as to certain details of the annual statements of the Lumber Company.

The statement of the Lumber Company of December 31, 1930, was the last statement made before the transaction of March 10, 1931, but the correspondence shows that the Trust Company had additional information and had questioned certain items in that statement.

That the capital of the Lumber Company had been impaired to the extent of at least $100,000, as of December 31, 1930, cannot be doubted, and this fact is shown upon the face of the statement itself. This impairment had been brought about by the declaration of the so-called liquidating dividends in the years 1928, 1929, and 1930, and the retirement of some of the shares of stock purchased by the Lumber Company. In addition to this, the audit of December 31, 1930, upon proper inquiry which, as we have said above, the Trust Company should have made, shows a large overdraft by Mahan, president of the Lumber Company, carried on the books of the Lumber Company as an asset, in the sum of $42,189.07. Nothing was ever realized on this item.

■ The fact that the Lumber Company had changed its stock from shares of a par value of $100 to the same number of shares of stock of no-par value does not in any way affect the question of the impairment of capital. The West Virginia statute provides that, where such a change is made, the aggregate amount of the capital of a corporation represented by such

shares should be the same as the aggregate amount of capital represented by the shares so changed. Section 11, art. 1, c. 31, West Virginia Code 1931. Even without this statutory provision, the law would be the same when such a change is made.

Having reached the conclusion that the capital of the Lumber Company was shown to be impaired as of December 31, 1930, it must necessarily follow that that part of the transaction of March 10, 1931, by which the Trust Company, in effect, sold the Lumber Company 1,000 shares of its stock to be retired, resulted in a further and a material impairment of the Lumber Company's capital. The purchase of the stock was in violation of the statute, ultra vires, and consequently void. It is also clear that the Trust Company knew, or could by proper inquiry have known, that the transaction of March 10, 1931, impaired the capital of the Lumber Company. The Trust Company, having upon its hands a bad debt, secured only by the stock of the Lumber, Company, cannot be allowed to profit by a transaction which takes away from the Lumber Company its assets in contravention of the rights of the stockholders of the Lumber Company, of the existing creditors of the Lumber Company, and of any who might become creditors of the Lumber Company through subsequent dealings with it.

Had the Trust Company, in due course of business, made a loan to the Lumber Company knowing that the money so lent was to be used for the purchase of the Lumber Company's own stock, in violation of the statute, without in any way directly benefiting by the purchase, the Trust Company would not have been put upon such strict inquiry as to the financial condition of the Lumber Company. It was the sale of the stock that was void. In the agreement prepared by Goble, an officer of the Trust Company, it was recited that the Trust Company was selling the stock. It is apparent that the Trust Company only made this loan in order to bring about the sale of the stock. It had, for reasons given, previously refused a loan to the Lumber Company, and had the same reasons for refusing this much greater loan, except for its interest in the transaction. The Trust Company is liable to the extent to which it benefited.

No decision has been cited interpreting the West Virginia statute, but decisions involving a similar statute in the state of Delaware, discussing some of the points here involved, have been cited. In re International Radiator Company, supra; West Penn Chemical Co. v. Prentice (C. C.A.) 236 F. 891; Acker v. Girard Trust Co., 42 F.(2d) 37.

In Gibbon v. Hill (C.C.A.) 79 F.(2d) 288, a seller of stock purchased by a corporation to be retired, which retirement impaired the capital of the corporation, was held liable and required to pay the receiver of the corporation an amount sufficient to pay claims of creditors and costs of administration of the receivership.

I cannot agree with the contention made on behalf of the Trust Company that the only creditors who might complain of the transaction have, with knowledge thereof, acquiesced in the same for a long period of time and that they cannot benefit by the action of the receivers. The existing creditors had no reason to inquire into the transaction, and were not fully informed as to its details until the receivers began an investigation. Not only the existing creditors but the future creditors of the Lumber Company had an interest in the matter, and there is a question of public policy involved. No one should be allowed to profit by a transaction made in violation of the law.

I am of the opinion that the Trust Company should make restitution only to the extent to which it benefited, and that it should not be required to repay the amount that Prichard received from the $50,000 loan. The receivers should look to Prichard for that. The Trust Company will be directed to pay to the receivers all the money it actually received from the sale of the Lumber Company stock, together with interest thereon from the date of payment. This would be the difference between the $42,319.97 paid it at the time of the sale of the stock and the balance remaining due on the debt, amounting to $28,500.

I do not feel, however, that the conduct of the officers of the Trust Company was such as to justify a court of equity in penalizing it to the extent of requiring it to be subordinated to the rights of other creditors of the company, and it will be allowed to file its claim against the Lumber Company as an unsecured creditor to the amount of the notes held by it plus the amount of money it will pay to the receivers.

An order will be drawn in accordance with the views above expressed.