## DABNEY v. CHASE NAT. BANK OF CITY OF NEW YORK.

No. 115, Docket 22129.

United States Court of Appeals Second Circuit.

Argued Feb. 4, 1952.

Decided April 30, 1952.

Clark and Swan, Circuit Judges, dissented in part.

Lewis M. Dabney, Jr., New York City, John A. Anderson, New York City, of counsel, for appellant.

Milbank, Tweed, Hope & Hadley, New York City, A. Donald MacKinnon, New York City, Eugene H. Nickerson, S. A. Lourie, New York City, of counsel, for appellee.

Before SWAN, Chief Judge, and L. HAND and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

The careful and extended opinion in the district court is reported in 98 F.Supp. 807, and, when read with our opinion upon the earlier appeal, Clarke v. Chase Nat. Bank, 2 Cir., 137 F.2d 797, states the conflicting positions of the parties and the facts as they were developed at the trial with enough detail to allow us to proceed without more to a discussion of the questions involved. The controlling issue is how far the corporate trustee of two series of unsecured bonds is bound to abstain from transactions with the debtor which may give it an advantage over the bondholders, its beneficiaries. More particularly, it is what doubts of the continued solvency of the debtor should bar such a trustee from collecting a personal claim against the debtor. The judge adopted the same standard that charges the creditor of an insolvent debtor with a preference under the Bankruptcy Act; and the first question is whether his findings must stand except so far as they are "clearly erroneous." We shall first address ourselves to the "Second Cause of Action": *i. e.* the bank's collection in 1932 of its loan of $4,000,000, reserving for the time being the "Fourth Cause of Action": *i. e.* the exchange of securities in August, 1934. The finding that the debtor, "Ageco," was insolvent in 1932 is one of fact, and certainly not "clearly erroneous," although, as will appear, that turns out to have been irrelevant, as we view the law. (Incidentally, the finding of insolvency in 1934 was *a fortiori* not "clearly erroneous.") The information which the bank in fact had when the loan was paid is not in dispute, and we shall assume for argument that the judge was right in concluding that it was not enough to charge a creditor in bankruptcy with a preference under § 60, sub. a of the Act, 11 U.S.C.A. § 96, sub. a, although that too we deem irrelevant. There remain two questions: (1), whether a lesser degree of notice will serve to charge the bank than would charge a creditor; and (2), whether, if so, the bank had notice enough to charge it in this case. The finding on the first question we may reverse, if we disagree

with it, as we do, even though our disagreement is not so positive that we think it "clearly erroneous." [1] The duty of a creditor to take no more than his aliquot share of the assets of an insolvent debtor is imposed by law; the duty of a trustee, not to profit at the possible expense of his beneficiary, is the most fundamental of the duties which he accepts when he becomes a trustee. It is a part of his obligation to give his beneficiary his unidvided loyalty, free from any conflicting personal interest; an obligation that has been nowhere more jealously and rigidly enforced than in New York where these indentures were executed.[2] "The most fundamental duty owed by the trustee to the beneficiaries of the trust is the duty of loyalty * * * In some relations the fiduciary element is more intense than in others; it is peculiarly intense in the case of a trust." [3] We should be even disposed to say that without this duty there could be no trust at all.

The defendant seeks to distinguish York v. Guaranty Trust Co., 2 Cir., 143 F.2d 503, 514 and Dudley v. Mealey, 2 Cir., 147 F.2d 268, 272, where we decided that the failure of a corporate trustee to use a power would make him liable, if his decision were induced in any degree by self interest; but the principle in those cases was precisely the same as here: i. e. whether the circumstances under which a trustee exercises a power are such that his decision may be influenced by his own interest to the possible detriment of his beneficiaries. The only difference between the cases cited and that at bar is that here, although the trustee had an express power: i. e. to lend money to "Ageco" (a power which did indeed imply a power to collect the loan), and exercised it, while there the trustees who also had express powers did not exercise them. That is unimportant; all that counts is

that the trustee's decision—whether to exercise, or not to exercise, the power—shall be free from conflicting personal motives. Matter of Durston's Will, 297 N.Y. 64, 74 N.E.2d 310, 313, is an example of how far the courts of New York have gone to search for such a possible conflict. The testator had given the trustees power "to hold, care for, manage and control" the property which he devised or bequeathed, and "to sell * * * any part or all thereof * * * to invest or reinvest the same * * * in such interest bearing or income producing securities" as they thought best. Part of the assets had been shares in the bank which he made one of the trustees, and these shares the bank held until they had greatly fallen in value. The bank was held for the loss because its decision to retain the shares might have been influenced by its desire not to have them put upon the market; and indeed even the individual trustee was held, although he had merely approved the bank's retention of the shares.

Hazzard v. Chase National Bank, 159 Misc. 57, 287 N.Y.S. 541; Id., 257 App.Div. 950, 14 N.Y.S.2d 147; Id., 282 N.Y. 652, 26 N.E.2d 801, is not to the contrary. With one exception it went no further than to decide that the bank had not been "grossly" negligent in not retaining part of the security; and, so far, it is not relevant here. The exception was a claim that the bank, being itself a creditor, released the security, so that it could be sold and the debtor could use the proceeds to pay the interest on its bonds, and thus avoid a general default to the prejudice of the bank's loan. This claim the judge disposed of by saying, 159 Misc. at page 66, 287 N.Y.S. at page 551, that "the purpose of the withdrawal of these securities, so far as the bank's knowledge has been proven, was in furtherance of an expansion policy and of a geographical

1. Sidney Blumenthal & Co., Inc., v. Atlantic Coast Line, R. Co., 2 Cir., 139 F.2d 288, 290; Great Atlantic & Pacific Tea Co. v. Brasileiro, 2 Cir., 159 F.2d 661, 665; Continental Insurance Co. v. United States, 2 Cir., 195 F.2d 527.

2. Ten Eyck v. Craig, 62 N.Y. 406, 419; Munson v. Syracuse, G. & C. R. R. Co., 103 N.Y. 58, 8 N.E. 355; Globe Woolen Co. v. Utica Gas & Electric Co., 224 N.

Y. 483, 489, 490, 121 N.E. 378; Meinhard v. Salmon, 249 N.Y. 458, 468, 164 N.E. 545, 62 A.L.R. 1; Marcellus v. First Trust & Deposit Co., 291 N.Y. 372, 52 N.E.2d 907; Matter of Ryan's Will, 291 N.Y. 376, 406, 407, 52 N.E.2d 909; Matter of Hubbell's Will, 302 N.Y. 246, 259, 97 N.E.2d 888.

3. Scott on Trusts, § 170.

realignment of operating and holding companies." Hence no question of a conflict of interest arose. We do not forget that later in his opinion, 159 Misc. at page 84, 287 N.Y.S. at page 570, the judge said that: "The trustee under a corporate indenture * * * has his rights and duties defined, not by the fiduciary relationship, but exclusively by the terms of the agreement. His status is more that of a stakeholder than one of a trustee. * * * Far from refraining from occupying inconsistent positions, corporate trustees have affirmatively and deliberately assumed them to an increasing degree. Corporate trustees have come to act as promoters, underwriters, bankers, financial advisers, bondholders, and creditors of companies whose debenture holders they have been selected to protect." That language we read only as criticism of practices that had grown up, and not as asserting that the courts of New York had given any countenance to the notion that, so far as a corporation sees fit to assume the duties of an indenture trustee, it can shake off the loyalty demanded of every trustee, corporate or individual. We can find no warrant for so supposing; and, indeed, a trust for the benefit of a numerous and changing body of bondholders appears to us to be preeminently an occasion for a scruple even greater than ordinary; for such beneficiaries often have too small a stake to follow the fate of their investment and protect their rights. We do not read Benton v. Safe Deposit Bank, 255 N.Y. 260, 174 N.E. 648, in an opposite sense; it held no more than that an exculpatory covenant limiting the trustee's liability to "gross negligence" was not contrary to "public policy" in New York as well as in Pennsylvania. True, in the course of the opinion Crane, J., said, 225 N.Y. at page 265, 174 N.E. at page 649, that "the duty of the trustee is measured and limited by its agreement"; and we of course agree that within somewhat ill defined limits a trustee may confine his duties. That question is necessarily determined by the trust deed; but it has nothing to do with the trustee's duty to discharge whatever obligations he does assume with absolute singleness of purpose.

Thus we come to the consideration of how far, if at all, the collection of the loan in the spring of 1932 conflicted with the bank's duty to the plaintiff's bondholders. If it did conflict, the power to collect should have yielded to the duty of loyalty, for all powers are to be interpreted as conditional upon observance of that duty. Although the judge found that the bank knew the financial condition of "Ageco" to be "bad," neither in his findings nor in his opinion did he define what that adjective meant, except in so far as that may be inferred by his saying that it did not know that "Ageco's" "condition was 'bad' enough * * * to be insolvent or in imminent danger of insolvency." He did indeed hold that it "had notice of facts which would lead a man of ordinary prudence—a bank at least—to make inquiry," but he also found that it had done so, for it "was not obligated to make more than a reasonably diligent inquiry," and a thorough-going inquiry would have been more laborious and expensive than could be "reasonably" demanded. So we shall assume. On the other hand, the record is full of evidence that in the spring of 1932 the bank's officials were most uncertain whether the "System" would be able to refund its long term debts and loans which were very soon to become due. Its lawyers had advised it that the first proposed expedient—an issue of a new "Ageco" series, guaranteed by "Agecorp"—was unlawful and about the second proposal— the "Agecorp 8s"—the lawyers were in some doubt; and it must be owned that, so far as concerned "Ageco's" covenants and in view of its absolute control of "Agecorp," it is very hard to understand why it was in substance any better than the first. After the bank had repeatedly examined the financial condition of the "System" at length, it was by no means certain that it would survive the crisis which in 1932 was so ominous. It is true that it thought it more likely than not that the "System" would survive but the future was most insecure.

This insecurity was certainly what the judge meant when he found that the bank knew that "Ageco's" condition was "bad";

that was indeed a very measured appraisal of the bank's doubts. For example, a report made in November 1932 by Place to the bank's president, Aldrich, contained the following passage: "It is not overstating the fact to say that early in this year many competent people with knowledge of the requirements of the System and in view of the then existing security conditions, regarded the task of meeting these maturities as extremely difficult, and in the event that strong banking support was not fully forthcoming, an almost impossible one." Place concluded with a "list of the more important criticisms, which are commonly directed at the Associated System," and which he said fell into four general classes. He thought that these "in certain cases may be said to have some foundation in fact," but they "must in all fairness to the company and the management, be looked at from the point of view of (1) whether any real damage was done to minority stockholders and (2) with an understanding of the problem or problems, particularly those occurring in the first six months of 1932 with which the company was forced to deal. It is obvious that a company fighting for its life under unprecedented conditions may, and probably must, resort to procedures which would not be undertaken if the company had millions of dollars in the bank and no pressing problem to meet." A company which is "fighting for its life" so hard that it must "resort to procedures" which, as the context shows, the writer thought to be of questionable propriety, was certainly a company whose continued solvency was most uncertain. In April, 1932, the bank wrote a correspondent that "the unsettled conditions * * * together with the remote position which these debentures occupy in relation to the source of earnings introduce considerable (*sic*) in the way of speculative elements, and the issue in question cannot be considered a desirable holding at the present time. * * * predictions as to future payments are hardly possible." Furthermore, the bank refused to renew the loan even for 90 days unless it was secured, and then only in case of a special agreement allowing its due date to be advanced, "covering defaults of top

company or any of its subsidiaries." Such a demand for security is not the less significant because the bank at the same time changed its policy and was demanding security on all loans; it does not indicate that a given loan is any the less precarious that all loans have become precarious. A trustee is not absolved from his duty to defer his own to his beneficiary's interest, because times have got bad; that is precisely the occasion that most calls for the exercise of forbearance. Love, a vice-president of the bank, testified that his "criticism was not of the company itself, as much as it was of the management." There was "no question" in his mind that the "main trouble * * * was not the company itself, but * * * the head," Hopson. He had "no doubt" that "Ageco," "while it might have tough sledding, had an excellent chance of coming through the storm"; but "there was a chance" also that it "would not come through." "With bank support" he had "no doubt" that there would be "no difficulty" in refunding the bonds that were to mature in 1932. Nevertheless, he "realized that it was a difficult task; but" he "wouldn't say that it was an impossible task." The price of the "Ageco" debentures fell from 39 on January 1, 1932 to 10 in June of that year; and it must be remembered that, unless the maturing bonds of the whole "System" could be financed, it would collapse.

We cannot agree that with such knowledge and such a forecast of "Ageco's" immediate future the bank was justified in collecting the loan. We say "collected" advisedly, not forgetting that over one fourth of it was paid before it became due. Nobody questions that "Ageco" would have welcomed an extension and asked for one; nobody doubts that it needed every dollar of credit that it could squeeze out. A creditor who accepts payment of part of a loan before it is due, from a debtor known to be "fighting for its life," and who insists upon security for the balance when it is due, has not merely sat by, receptive to the debtor's voluntary advances; he has compelled payment; and to compel payment when the debtor's survival was as doubtful, as the bank's own declarations

show that it knew "Ageco's" survival to be, was to secure itself by the depletion of assets which, in the event of "Ageco's" insolvency it would be obliged to share ratably with all of "Ageco's" creditors, including the plaintiff's bondholders. Collection would manifestly result in the bank's preference and would indubitably be a breach of its duty as trustee. It was equally a breach of that duty presently to assure itself of such a preference against the chance that the insolvency might occur.[4] This was a breach, regardless of "Ageco's" actual insolvency; it was a breach because the trustee put itself in a position of advantage *vis-à-vis* its beneficiary. True, it might turn out to be a breach which neither harmed the beneficiary, nor profited the trustee; but that only means that the beneficiaries would need no remedy; it was none the less an act in violation of the bank's duty.

It is hornbook law that the beneficiary's remedies for a breach of trust are the recovery of any damages which may result, or of any profit which the trustee may have gained. Restatement of Trusts §§ 205, 206. In the case at bar the amount of the damages and of the profits is the same, unless we hold, as the plaintiff wishes us to hold, that the damages include the whole sum collected, $4,000,000. That would result in the plaintiff's bondholders' receiving, not alone the assets which the bank took away from them, but in addition an added payment of whatever should turn out to be the value of the bank's rights in the reorganization, for the bank was entitled to that amount anyway. Adopting a phrase in our opinion on the former appeal, the plaintiff calls this the bank's "right of subrogation"; and asks us to forfeit it because of the bank's misconduct. It is true that courts have denied any compensation for a trustee's services, if he has been guilty of a breach of trust; and have even refused to allow him his expenses, except in so far as they have benefited the estate. Restatement of Trusts §§ 243, 245. But we know

of no case in which a court has forfeited his preexisting rights because of a breach of duty, that would be penalty, pure and simple. The nearest analogy is that of a creditor who receives a preference, voidable in bankruptcy, and after a good deal of confusion (owing, however, only to the terms of the statute) it was finally settled that such a creditor did not forfeit his claim. Keppel v. Tiffin Savings Bank, 197 U.S. 356, 25 S.Ct. 443, 49 L.Ed. 790. That decision was followed in Page v. Rogers, 211 U.S. 575, 581, 29 S.Ct. 159, 53 L.Ed. 332, and has been recognized as recently as 1935. Adams v. Champion, 294 U.S. 231, 235, 55 S.Ct. 399, 79 L.Ed. 880. We need not say that the conduct of an express trustee can never be such as to constitute a deliberate fraud upon the estate and make him a trustee *ex maleficio*; and we will assume *arguendo* that such a trustee may forfeit even a preexisting claim. The bank's conduct was far removed from anything which could justify such a characterization; and we hold that the utmost damages that the plaintiff's bondholders could have suffered was the difference between $4,000,000 and what would be the value of the bank's claim for $4,000,000 in the reorganization. If we assume that the loan would have remained still outstanding in 1940—the assumption most favorable to the plaintiff's bondholders—this sum would have been exactly the same as the bank's profit in the transaction. We shall therefore disregard the question of damages and confine ourselves to that of the bank's profits which it was in any event bound to restore. Since it is always irrelevant how long after the breach the trustee's profit is realized, in this case we may disregard the fact that the amount of the bank's profit—and, indeed, whether it would ever have a profit—was not determined until "Ageco" became insolvent.

However, we have hitherto assumed that the plaintiff may recover the entire profit which the bank made, and that is not a necessary consequence of the breach. Two

4. Scott v. Ray, 18 Pick., Mass., 360, 366; First Trust Co. of Lincoln v. Ricketts, 8 Cir., 75 F.2d 309, 312; Marshall & Ilsley Bank v. Guaranty Investment Co., 213 Wis. 415, 250 N.W. 862; Reichert v. Guaranty Trust Co., 261 Mich. 315, 246 N.W. 132; Caldwell v. Hicks, D.C., 15 F.Supp. 46; Scott, on Trusts, § 170.23.

points are involved, which the briefs do not discuss and upon which we wish supplementary briefs. The first point is this. Since "Ageco" had creditors other than the plaintiff's bondholders, and since all "Ageco's" creditors stood *inter se* without priority, any sum by which "Ageco's" assets would have been increased in 1940, had the loan not been paid, would have been divided proportionately among all the creditors, and the plaintiff's bondholders would have received only their aliquot part. The trustee owed no duty to any of "Ageco's" creditors except the plaintiff's bondholders, and the first point is whether the recovery should not be limited to the aliquot share of those bondholders as just defined. The second point to be discussed is this. Between May 1932 and January 1940 many of the bondholders of the two series presumably transferred their bonds to third persons. Did any rights of such bondholders against the bank pass to the transferees; or did they remain in the transferors, and, if so, does the plaintiff represent them? In Manufacturers Trust Co. v. Kelby, 2 Cir., 125 F.2d 650, where the claim against the trustee was for a wrongful release of part of the security, we held that the claim passed to the transferees of the bonds. In Elkind v. Chase National Bank, 259 App.Div. 661, 20 N.Y. S.2d 213, affirmed 284 N.Y. 726, 31 N.E.2d 198, in a case where the claim against the trustee was for diversion of the debtor's income from the bondholders to the trustee itself, the New York courts held the claim did not pass to the transferees, but remained in the transferors. In Smith v. Continental Bank and Trust Company, 292 N.Y. 275, 54 N.E.2d 823, Court of Appeals held that a bondholder who held his bonds at the time of the breach might sue the trustee, though he had transferred his bonds. What rule should apply here? Included in this point is the question whether bondholders who surrendered their bonds under one of the options of the "Recap Plan" retained any claims against the bank; and whether, if so, the plaintiff represents them.

There remains the second claim: *i. e.* that the bank should be held liable for its profit, if any, upon the exchange of securities on August 28, 1934; or in the alternative that it should be compelled to rescind the exchange. We shall assume arguendo that at the time of the exchange the financial condition of the "System" as a whole had grown worse than in 1932—that of "Ageco" along with the others—; and, if so, the risk had correspondingly increased that the plaintiff's bondholders would not be paid. The "Recap Plan" did in the end stave off insolvency for about five years; but it was uncertain in August, 1934, how many of the "Ageco" bondholders would accept any of the proposed options, and therefore whether the "Plan" would be successful. That does not, however, answer the question whether any profit made by the bank upon the exchange was a breach of loyalty to its beneficiaries, until we have determined what was the probability that any such profit would reduce the dividend of the plaintiff's bondholders in the event of "Ageco's" insolvency. Owing to the labyrinth of intercorporate relations which Hopson had contrived, the answer is not easy. Except for $52,000 of securities which we shall disregard, the only securities that the bank received on the exchange, and out of which it could make any profit, consisted of bonds of the "Associated Electric Company," a holding company, whose assets were for the most part the stocks, notes and bonds of two holding and two operating companies, whose assets gave to the bonds substantially all their value. A report of one, Robinson, to the bank at the time of the exchange gave these bonds a favorable rating so far as concerned the obligor's income; but the plaintiff's witness, Hartt, valued them at 82 and their price in the market was only 35½, which Love appears to have accepted. Even at 82 the bonds were on a more than six per cent basis, and at 35½ their basis was probably over 15 per cent; they were therefore at best uncertain, and the market obviously thought them to the last degree speculative. The parties from which the bank received the bonds on the exchange were four corporations, three of which were holding companies, and the fourth an "investment" company, whatever that

may mean; and the record does not disclose the financial condition of any of these, without which we cannot know what value the bonds would have added to the shares of the four companies in case of their insolvency. Yet it is that which we must know, if we are to say how much the exchange could have affected the plaintiff's bondholders, because it was only as a shareholder of the four companies that "Agecorp" had any interest in the bonds, and only as "Agecorp's" shareholder that "Ageco" at that time had any interest in "Agecorp" (save for $19,000 of indebtedness which is negligible).

■ Thus no profit made by the bank on the exchange could come out of the plaintiff's bondholders unless all the following circumstances coexisted. (1) The corporations, whose securities made up the assets of the "Associated Electric Company," did not themselves become insolvent, or at least that their assets did not pass a substantial dividend to the "Associated Electric Company." (2) The four corporations which owned the bonds and delivered them to the bank did not become insolvent, so that "Agecorp," their shareholder, would receive something upon their shares which it held. (3) "Agecorp" itself remained solvent, so that "Ageco" its shareholder would receive something on "Agecorp's" shares. (4) "Ageco" itself became insolvent. It was indeed a possibility that this particular chain of events would take place, though in fact it never did; moreover the bank was intimately acquainted with all the details of the "System." However, it is not every possibility, however remote, of a conflict of interest between a trustee and his beneficiary which will forbid his entering into a transaction with a third person. Although, as we have seen, the disabilities of a trustee, *vis-à-vis* his beneficiary, are to the last degree exacting, especially in New York, there must come a point at which he is not bound to take against himself a future chain of events, each link of which carries a substantial coefficient of improbability. Pushed with relentless logic, a possible conflict of interest can be conjured up out of all sorts of situations in which persons of normal scruple would feel no hesitation to go ahead. The law ought not make trusteeship so hazardous that responsible individuals and corporations will shy away from it. As we said in York v. Guaranty Trust Co., 2 Cir., 143 F.2d 503, 514: "Of course, the courts should not impose impractical obligations on a trustee. Merely vague or remote possible selfish advantages to a trustee are not sufficient to prove such an adverse interest as to bring his conduct into question." [5] To hold that the bank should have abstained from the exchange because all the circumstances we have mentioned might conjoin, would exact a standard of unreasonable compunction. It would be likely to impede the legitimate business of trustees far more than it would protect their beneficiaries. The plaintiff answers that we should disregard the cumulation of corporation on corporation, because economically the "System" was as a whole a single reservoir, from which any withdrawals would inevitably lower the top level, where were the plaintiff's bondholders, the junior creditors. That would be true, if all the intermediate corporations remained solvent; but it would be true only in that event. The "System" was made up of an immense number of groups, which had their mutual priorities; and withdrawals from the assets of one subsidiary would have no effect upon corporations higher in the hierarchy unless the creditors of the subsidiary were paid in full.

It follows from what we have said that the judgment on the "Fourth Cause of Action" must be affirmed; but that the judgment upon the "Second Cause of Action" must be reversed, subject to final disposition after the supplementary briefs have been filed. The plaintiff will file his brief within thirty days after this opinion is filed; the defendant will file its answering brief within twenty days thereafter.

5. See for example, Anderson v. Bean, 272 Mass. 432, 172 N.E. 647, 72 A.L.R. 959; Bullivant v. First Nat. Bank, 246 Mass. 324, 141 N.E. 41; Pike v. Camden Trust Co., 128 N.J.Eq. 414, 16 A.2d 634.

Judgment reversed on the "Second Cause of Action"; appeal to be finally disposed of as indicated.

Judgment affirmed on the "Fourth Cause of Action."

SWAN, Circuit Judge (concurring in part and dissenting in part).

I am in complete accord with so much of the opinion as affirms the judgment on the "Fourth Cause of Action." I am unable to agree with that portion of the opinion which holds the defendant liable for accepting payment of its loan. The trust indenture expressly permitted the trustee to make loans to "Ageco." A six months' loan without security was made October 16, 1931. Partial payments were made in March 1932, before maturity, and the balance was paid May 11, 1932. I agree that a trustee, even though the trust instrument permits him to lend money to the settlor of the trust, is under a fiduciary duty not to collect the loan if he has reason to believe that collecting the debt will impair the likelihood of his *cestuis* receiving payment of debts owed by the settlor to them, but I cannot view this as such a case. The trial judge found that the proof did not establish that the Bank had reasonable cause to believe that Ageco was insolvent or in imminent danger of insolvency in March or May 1932. Judge Hand's opinion recites facts which show that the Bank's officials were uncertain whether the Ageco "System" would survive the 1932 crisis and be able to refund its long term debts and loans which were soon to become due, and "thought it more likely than not that the 'System' would survive, but the future was most insecure.". My brothers hold that this is enough to require the Bank to account for "profits." I agree that if there was a breach of fiduciary duty in collecting the debt the Bank's "profits" should be determined as suggested in Judge Hand's opinion. But I am not convinced that there was a breach of fiduciary duty. The debtor did not go into bankruptcy until 1940. In 1932 there was no reason for the Bank to suppose that accepting payment of its debt would accelerate by a single day a bankruptcy which the debtor was able to avert

for eight years or that, if the debt were not paid, the debtor would have one cent more of assets for distribution in a reorganization not then imminent. To this situation I would apply the same principle which leads us to affirm the judgment on the fourth cause of action, namely, that "merely vague or remote selfish advantages to a trustee are not sufficient to prove such an adverse interest as to bring his conduct into question."

CLARK, Circuit Judge (concurring in part and dissenting in part).

I concur in the opinion holding defendant liable for the repayment of the loan to itself and leaving the amount to be settled after the filing of briefs by the parties developing the issues. But I do not agree with the holding absolving defendant of any liability with respect to the second transaction complained of.

This latter transaction was an exchange of securities—under an agreement effected by the Ageco management—between defendant Chase and four subholding companies of the system. Acting as an individual trader and not in its capacity as trustee, Chase delivered some $4,249,000 face amount Ageco debentures and other utility notes; in turn it received securities of certain lower constituents of the hierarchy. The district court did not get to the point of setting values to the securities involved and probably we should not attempt to do so here. But for purposes of our discussion of defendant's legal liability we may assume the plaintiff's claims—based on the testimony of the expert Hartt, which was generally accepted by the court —that defendant received securities worth some two million more than it gave up. The opinion holds that defendant need not replace the securities or otherwise give up this advantage on the ground that possibility of loss to Ageco's bondholders was too remote; since the securities received by defendant came from subholding companies some tiers down from Ageco, the resulting insulation mitigated possible effects on Ageco's security holders to such an extent that they could not complain. But this, it seems to me, is based on an er-

roneous concept of the working of the capital structure of a holding-company system. For the closer to the operating companies a reduction of assets occurs, the more explosive its effect.

The basic principle of holding-company finance is that of leverage through pyramiding.[1] All earnings originate as revenues of the operating companies. Since each holding company generally owns only the equity voting stock of the company below—which stock can pass dividends only after prior fixed charges are met—the income filters up through the system to the top only as excess over the preferred claims against the lower companies. Hence the profit of the top holding company is in the highest degree speculative, since it represents only the balance left after a host of prior calls on income are satisfied.[2]

I cannot escape the conclusion from this that the security holders of the top holding company suffer first whenever assets—either operating properties or securities—are reduced within the system. And the further down an unfavorable exchange occurs, the more highly magnified its effect is on the upper tier of security holders. So the occurrence of the four circumstances which the opinion assumes necessary before the Ageco debentures would be injured by this unfavorable exchange—the insolvency of Ageco and the solvency of the various undercompanies—does not appear unlikely or highly speculative. Ageco would almost inevitably be the first one unable to meet its interest and dividend requirements.[3]

I take it to be clear that had Chase made the exchange directly with Ageco, its resulting gain is one that it would have to give up in view of its fiduciary obligations to the bondholders of Ageco and the latter's insolvency. But here the situation is

not different save that the loss may be potentially greater as it ripples up through the tiers of companies.

I would therefore remand this part of the proceedings to the district court for findings as to the relative value of the exchanged securities. Such remand should probably await decision on the other branch of the case settling the appropriate rule of damages if benefit is found.

1. Bonbright & Means, The Holding Company, 1932; Comment, Section 11(b) of the Holding Company Act: Fifteen Years in Retrospect, 59 Yale L.J. 1088–1092.

2. An excellent short description of this pyramiding effect is to be found in Trachsel, Public Utility Regulation 385–393, 1947.

3. Barring the use of such dubious and more or less temporary devices as high-priced servicing contracts, asset write-ups, or inadequate depreciation reserves to pump income into the top levels when operating profits are inadequate. See Federal Trade Commission, Utility Corporations, Sen. Doc. No. 92, Part 72-A, 70th Cong., 1st Sess. 352–355, 440–448, 496, 847.