## In the Matter of the Estate of ZETTIE DALSIMER, Deceased.

Surrogate's Court, New York County, August 5, 1936.

*Davis, Polk, Wardwell, Gardiner & Reed* [*Theodore Kiendl, Otis T. Bradley* and *Edwin E. Peterson* of counsel], for Guaranty Trust Company of New York, one of the trustees.

*Norlinger, Riegelman & Cooper* [*Harold Riegelman* and *David B. Lefkowitz* of counsel], for Carrie Dalsimer, as sole executrix of the will of Nathan S. Dalsimer, deceased, cotrustee.

*Cutler & Cutler* [*Julius Cutler* of counsel], for Carrie Thalheimer, life beneficiary of trust, and for Augusta Dalsimer, life beneficiary of trust.

*Elmer F. Quinn*, special guardian.

DELEHANTY, S. By consent of counsel testimony was taken *in solido* in these three contested accounting proceedings. The same issues are raised in each — except for one variance which will be separately mentioned.

The record requires consideration of mortgage investments made by the accounting trustee in respect of some aspects of which diligent and competent counsel have found no controlling authorities. Since the matters here in controversy will increasingly engage the attention of the courts until the effects of the general depression have been liquidated it will be a desirable outcome of these proceedings if they furnish an authoritative appellate declaration of principles applicable to the facts here disclosed.

In each accounting the investment criticised is that made by the allocation to the respective trust of a participation in a whole mortgage held by the trustee on premises located on the northeast corner of Sixth avenue and Fifty-eighth street, Manhattan, New York city. Since some point is made by one of the parties that the

trustee in its private corporate capacity was the owner of this mortgage and hence under especial restrictions in dealing with it, some comment should be made on the way in which the trustee handled mortgage investments for trust funds generally. Its trust department operations involve large sums of money. The aggregate of its trust accounts necessitates advance provision for the recurrent investment and reinvestment of funds as they may become available. In order to have mortgages on hand suitable for trust investments it is the practice of the trustee to seek mortgage loans in amounts appropriate to fill its prospective needs. It does not wait for specific funds to become available and then seek an investment for them, but seeks to have on hand at all times mortgages in which trust funds may be invested forthwith. In attaining this commendable objective it is necessary that the private funds of the trustee be used in the original purchase of the mortgages. By proper inter-departmental accounts the advances so made temporarily are reimbursed to the trustee as soon as the trust funds are invested. The proof in these proceedings establishes that the trustee made these advances and original mortgage purchases merely as a convenience in its trust administrations and held its investment in a suspense account pending clearance by the coming in of adequate trust moneys. So the court holds that the temporary employment by the trustee of its private corporate funds in acquiring the mortgage here criticised brought into effect no different or graver liability than if the trustee had waited until accumulated trust funds had sufficed for the purchase.

One or more of the objectants (but not all) assert that the notice to the beneficiaries of the allocation of a participation in this mortgage was fatally defective in that it did not say that the trustee was itself selling the participation. This separate objection is held to be unsound and the notice sent is held to be adequate. The comment in the *per curiam* opinion in *Matter of Roche* (245 App. Div. 192) does not support the objection when understood in its relation to the actual record upon which the comment was based. The other cases cited by these separate objectants do not touch the point here urged.

The remaining objections are jointly urged by all objectants. In substance it is contended (a) that the will forbids the type of investment criticised, (b) that the mortgage was in excess of the statutory limit for trust mortgages, and (c) that in any event and on many grounds the investment of the trust moneys was improvident when made. Surcharge is asked for all these reasons.

The will of deceased authorized her trustees " to invest any funds belonging to such trusts in securities which are legal investments

for trust funds in the State of New York, no investment in any one security, unless the investment shall be in bonds and mortgages on unincumbered real property, shall exceed Five Thousand Dollars ($5,000)." It is argued that these words are restrictive and exclude any but whole mortgages as permitted investments. The court holds the contrary view. The practice of investment by trustees in parts or shares of whole mortgages had received judicial sanction over a period of years prior to the decision in *Matter of Union Trust Co.* (219 N. Y. 514), which only restated existing law on the subject. There is nothing in the language of this will which expressly bars such investments. They constitute investments " in bonds and mortgages "— to use the language of the will. *Matter of Waxelbaum* (156 Misc. 45) is distinguishable since the investment there held to be unauthorized was not of the sort here involved. In a later paragraph of this decision comment will be made on the term of the will which limited the trustees to mortgages " on unincumbered real property."

The objections that the mortgage total exceeded the limit permitted for trust investment and that the investment was in any event improvidently made will be considered together since the proof was presented from the same sources in support of both objections. In general it is shown that the building was over thirty years old at the time the mortgage shares were allocated to the trusts. It stands on a corner plot 100 feet by 100 feet. It originally contained large apartments on the eight upper floors, offices on the second floor and stores on the ground floor. The apartments had been altered into a much larger number of smaller suites. So long as the adjacent corner of Fifty-ninth street and Sixth avenue remained undeveloped the Fifty-eighth street corner was naturally under consideration as part of a block front development. That combination use of the plot was no longer possible when the mortgage was purchased because the Fifty-ninth street corner had been separately developed by the construction of the Hotel St. Moritz. Thereafter the development of the Fifty-eighth street plot was limited to structures adapted to its own area only. There seems to be agreement among the experts that a modern hotel or multiple dwelling building with stores on the ground floor is the only indicated future development.

The mortgage was purchased in October, 1930. At that time there was no presage of the collapse of the mortgage guaranty companies which occurred a few years later and there is fair reason in this record to assume that the guaranty which accompanied the purchase of the mortgage was largely relied upon by the trustee in

making the purchase. The trustee obtained no independent appraisal of its own but was supplied by the mortgage guaranty company (the seller) with two appraisals, apparently made by its own employees. The mortgage principal was $775,000, and so the minimum value required to qualify the mortgage as a legal investment was $1,162,500. The appraisals stated the value to be $1,300,000. In 1930 the property was assessed for taxes at $1,225,000. In each appraisal the land was asserted to be worth $1,100,000 and the building $200,000. In the report on the mortgage application made by the inspector employed by the trustee it is stated: " The present building can, of course, only be considered as a temporary improvement to remain until such time as the plot is improved with a more adequate building in view of changed conditions in this neighborhood." No check-up of rents appears to have been made but a rent statement of the owner furnished to the selling company seems to have been accepted by the trustee as adequate. In this rent statement and in the report of its inspector the trustee was advised that leases were made on a basis of cancellations in thirty to ninety days. The rent statement (if true) showed sufficient income in October, 1930, to pay mortgage interest, taxes and normal operating or housekeeping charges. The mortgage interest was payable March first and September first. Interest due March 1, 1931, was duly paid. The check therefor was received in due course from the mortgage guaranty company.

In July, 1931, the criticised allocation of participations were made. Nothing except deposit of the March interest check had been done by the trustee in the interval. In quite obvious reliance on the guaranty by the selling company, the trustee made no check-up either on physical condition, rentals, vacancies or values preliminary to making the allocations. The head of its real estate department stated in effect that so long as interest was paid by the guaranteeing company the trustee assumed that no action on its part was necessary and it took none. Had it made a check-up on July 9, 1931, it would have discovered that water charges in excess of $1,000 were a lien on the property; and it would have found of record a great number of violations against the property. Of these latter many had been complied with or had been withdrawn or had been dismissed before July 9, 1931; and in respect of some others there was doubt of the authority of the department to take the action which it did. The cost of complete compliance with all recorded violations was about $5,000. The water charges were not paid until January, 1932, and the violations were not cleared of record until various dates running from 1931 to 1935. The guar-

anteeing company took a rent assignment in November, 1931. It, claimed, when its agency was terminated, to have advanced of its own funds to the trustee nearly $23,000 in excess of its receipts from the mortgagor and from the property. Its agency was continued until April, 1934, when the trustee took over the property. No interest has been paid on the certificates since 1933. Since September, 1931, such interest payments as had been made had apparently been possible only because the guaranteeing company used its own funds for the purpose or took rents and paid them over as interest at the cost of letting taxes go unpaid. The taxes have now been paid only because the trustee has advanced about $136,000 of its own funds for that purpose. The property does not earn any net return available for interest and has not done so since the fall of 1931. The advances of the trustee are still unrefunded.

Point is made by objectants of that text of the will which restricts mortgage loans to those made " on unincumbered real property." It is the view of the court that this phrase adds nothing to the preceding requirement that funds be put into legal investments only. The phrase is only descriptive of one type of such investments and is not to be given any unusual significance.

On the other hand, the trustee asserts that since the incumbrances of record were actually paid by January, 1932, and since the violations have actually been cleared of record, no argument may be based by objectants now upon their existence in July, 1931. This argument is rejected. While the payments have been made and the work done it has been at the cost of adding an equivalent or larger burden. No payment was made out of surplus nor except at the continued prejudice to the mortgagees.

There are left for consideration what seem to the court to be two major questions presented on this record. The first is whether the trustee was justified in making the allocations without renewed inquiry at or about their date and the second is whether the type of mortgage invested in was suitable for trust funds. The court holds that each question should be answered by a negative.

The lapse of time from October, 1930, to July, 1931, was so substantial as to have required a re-examination of the status of the property, its record title condition, its physical condition, its rental status, both present and prospective, and its probable future as then ascertainable. The trustee was not warranted in assuming that conditions remained static respecting the property. While no collapse of realty values had yet occurred, the general shakiness of business and the effect thereof on trade and upon individuals had become manifest. The trustee could not properly disregard these

portents and cannot escape responsibility for acting without knowing what a proper inquiry in July, 1931, would have disclosed. At that time it would not have made a new mortgage on the property in its then condition. So its realty department head testified. It cannot say merely that it did not know and that in good faith it relied on a continuance of the October, 1930, conditions. It was charged affirmatively with the duty to know the relevant facts as of the date when the trust funds were invested. Its neglect to inquire suffices to charge it with liability.

All the foregoing commentary assumes as a preliminary that the mortgage was at one time suitable for the investment of trust funds. The court holds that it was never eligible as such. This holding is not based on the matter of value but on the nature of the site, the character of the building and the inevitable future problems which confronted owner and mortgagee when the mortgage was placed. As to value, the evidence of objectants fails to preponderate over that furnished in behalf of accountant. Even if it be assumed, however, that the value of the land and building was fifty per cent in excess of the mortgage debt the mortgage was still unsuitable for trust investment. There is a duty on a trustee to invest only when safety of principal and continuance of income during the life of the investment are both reasonably assured. Here there was no assurance even of continuity of the investment. The mortgage contained a prepayment clause operative at any time after May, 1931. The report of rents furnished by the owner to the guaranteeing company and the report to the trustee by its own inspector concurred in showing that what was in contemplation was in actual fact a temporary loan to be substituted by the permanent financing of the new improvement to be put on the site after the existing building was demolished. The owner was not dealing with the building as suitable for the site. The trustee's inspector expressly reported that it was not suitable. The appraisers each assigned to the building a mere fifteen and four-tenths per cent of the total value ascribed by them to the site. The alterations in the building were patently for temporary use only. The leases were made subject in most cases to thirty day cancellations, with consequent diminution of assurance of future occupancy. The whole atmosphere of the property presaged an early demolition of the building. It was not intended to be the source of income from the site. Some successor building was to furnish that.

In such circumstances there was clear lack of proper care by the trustee in putting trust funds into this mortgage. It would not have made a building loan with trust funds. This loan is scarcely

to be distinguished from the first advance customarily made on such loans on the security of land value. While owners of unrestricted funds may make such loans as this a trustee should not. There was here no doubt that the owner had no liability on the mortgage bond. No one suggests that the actual obligor had any personal resources. The mortgagee had only this unsuitable building to look to for income when and if the owner decided to abandon his building project or was compelled by circumstances to do so. That such a project might fail was a commonplace in the realty field. Such failures occurred in good as well as in bad times. The trustee by this investment tied itself and the funds in its charge to a speculation in real estate development. The temporary earnings of the old and unsuitable building on the site do not palliate or obscure the essential and underlying fact that the loan was made in part on a building to be demolished. It may be argued, of course, that the mortgagee could demand payment as a condition to demolition but that argument only emphasizes the fact already commented on that this was not intended as a permanent investment in a sound site with a sound structure on it but was in truth the first step in financing a building speculation. That sort of mortgage loan should not be made with trust funds.

It does not clear the trustee of liability that a guaranty accompanied the mortgage. As to interest the guaranty contemplated current payment. As to principal the guaranty required payment only at the end of eighteen months after formal demand made following a default. A trustee cannot rely on a guaranty to make valid an otherwise invalid investment. The underlying security for the loan must itself be adequate and the nature of the loan such as to warrant the use of trust funds in making it. If these conditions pre-exist the trustee might lawfully pay the percentage of income deducted by the mortgage guaranty company and thereby gain the compensating advantage of the guaranty. But a trustee cannot make a loan on a guaranty.

Because basically the mortgage was unsuitable for trust funds and because secondarily the trustee was at fault in making allocations to these trusts in July, 1931, under the conditions then existing, the objections are sustained and the trustee charged with the capital sum in each trust shown to have been invested by it in the mortgage criticised. Since the property itself produced the September, 1931, interest, the objectants may retain the advantage of the five per cent rate then paid; but since all later payments were derived eventually from sources other than the property the interest chargeable to the trustee will be a net four per cent dating from September 1, 1931. The trustee will be entitled to credit for the

overpayments up to 1933 against its liability at four per cent thereafter. It will not be entitled to any income commissions on the interest so surcharged as the rate has been fixed on the basis of an attainable net return during this period to beneficiaries after all deductions.

A question of construction is raised by one of the parties in interest. By subparagraph (g) of clause third of her will, deceased set up a trust fund of $100,000 for the benefit of her son Sidney S., and directed that if his wife survived him (she has) the income should be paid to her after his death. The principal is payable to their issue after both intervening lives terminate. Trusts in similar amount were erected by the earlier subparagraphs of the same clause of the will for the benefit of two other sons of deceased. These sons were each given the power to appoint the principal. The clause contains a further subdivision which says in part:

" In the event that the income of each of said trust funds created under Paragraphs ' e,' ' f ' and ' g ' under the third clause of this will, shall be insufficient to give to the several beneficiaries therein named the income hereinafter mentioned, I direct my said trustees to pay to each of such beneficiaries out of the principal of the trust fund held for his benefit any sum or sums which it may be necessary to add to such net income to pay to the said several beneficiaries annually the amounts set opposite their respective names, as follows:

" To Sidney S. Dalsimer, Thirty-six Hundred Dollars ($3600);
" To Nathan S. Dalsimer, Thirty-six Hundred Dollars ($3600);
" To Philip T. Dalsimer, Thirty-six Hundred Dollars ($3600)."

The widow of Sidney S. Dalsimer asserts her right to have paid her annually a minimum of $3,600 whether from income or principal. She argues that she is one of " the several beneficiaries therein named " within the meaning of the quoted clause. She argues, too, that since Sidney's issue must be supported until they are entitled to take the principal, the intent of testatrix must have been to provide a minimum family income of $3,600 whether Sidney survived his wife or not. The special guardian for the infant remaindermen points out the fact that the only direction to pay $3,600 annually is that which specifies the beneficiaries by name and that the widow of Sidney is not one of those named. The court concurs with the special guardian's view and holds that the widow of Sidney S. Dalsimer is entitled only to such income as may be earned on the trust and that she has no right to any part of the principal.

Submit, on notice, decree construing the will and settling the account accordingly.