By this bill complainants ask to have four certain trust investments set aside and replaced by cash. They claim under a deed of trust dated June 3d 1929, of which their testatrix, Letitia J. Baker, was the settlor and of which the Camden Safe Deposit and Trust Company (merged in 1938 with the West Jersey Trust Company to form the defendant company) was the trustee. Relief is sought on the ground that the trustee, by reason of interests said to be in conflict with those of the complainants as beneficiaries of this trust estate, violated *Page 415 
established principles of trust administration in making the investment in question. The facts are briefly these:
On the same day that Letitia J. Baker executed the aforesaid deed of trust, she delivered $3,000 to her trustee (hereinafter to be referred to as the defendant) for the following uses and purposes:
"To have and to hold, and to invest, reinvest and keep invested the same in such securities as in the judgment of the said trustee shall seem to be advisable, whether the same be those securities which are authorized for the investment of trust funds by the laws of the State of New Jersey, or otherwise, and after deducting all taxes, charges, expenses and commission incident thereto, to pay the net income derived therefrom to me the said Letitia J. Baker for and during the term of my natural life or until such time as this trust shall be revoked by me as hereinafter provided, and at and after my death, if the power of revocation which I have hereinafter reserved to myself has not been exercised by me in my lifetime, the said Trustee shall pay over, transfer and deliver the principal of the said trust estate in its hands at that time, together with all income therefrom to the Executor of my Estate or to my administrator."
Later, on August 15th, 1929, Mrs. Baker deposited an additional $5,185 under said agreement. The four investments which the defendant made under this trust agreement and which complainants challenge in this proceeding, are as follows: On August 6th, 1929, defendant-trustee invested $1,000 of the Baker trust funds in a participation certificate in a $200,000 mortgage, dated May 6th, 1929, covering the newly built Elks Home on Cooper street, in Camden; on July 1st, 1930, $2,000 of the trust funds was invested by the defendant in two $1,000 bonds of Leeds and Lippincott Company, which said bonds were secured by a $2,500,000 mortgage or deed of trust to Camden Safe Deposit and Trust Company covering certain premises known as the Chalfonte Hotel properties in Atlantic City; and on October 23d 1930, a similar $1,000 bond of the Leeds and Lippincott Company was purchased by defendant for the trust.
The settlor died on February 25th, 1935, and by the terms of her will devised and bequeathed her residuary estate to Fannie Pike, Julia A. Duffee, Cecilia J. Colgan, who are complainants herein, and to Lottie A. Gamben and Katherine *Page 416 
Gerke. The complainant Frederick Gerke was appointed executor of the estate. On August 13th, 1935, Lottie A. Gamben died testate and devised and bequeathed her residuary estate to Katherine Gerke and to the complainants Frederick Gerke, Cecilia J. Colgan and Julia A. Duffee. On May 25th, 1937, Katherine Gerke died, having devised and bequeathed her residuary estate to the complainants Frederick Gerke, Cecilia J. Colgan and Julia A. Duffee.
Complainants, who claim either as residuary legatees under the will of Letitia J. Baker, the settlor, or as residuary legatees under the wills of settlor's deceased residuary legatees, set forth four separate causes of action in their bill. The first alleges that defendant purchased a large block of Leeds-Lippincott Company bonds for its own investment on the same day that it purchased two bonds of the same issue for the Baker trust, thereby placing itself as a creditor of the Leeds-Lippincott Company in direct conflict with its duties as trustee under the Baker trust agreement. The second cause of action alleges that defendant's purchase, on October 23d 1930, of another Leeds-Lippincott Company bond for the trust was also made in violation of its fiduciary duties because this bond was bought from itself out of the large block of the same bonds purchased earlier in the year in its individual capacity. The third cause of action challenges the propriety of the investments in the Leeds-Lippincott Company bonds on the ground that when the defendant made these investments as trustee under the Baker deed of trust, it was at the same time acting as trustee under the Chalfonte Hotel mortgage which secured the bonds, and for these latter services, had received a fee of $7,000 thereby violating fiduciary duties owed the Baker trust.
The investment of trust funds in the Elks mortgage participation certificate is challenged in the fourth cause of action as having been made by the defendant in violation of its statutory duty as a fiduciary to invest trust funds only in mortgages which are a first lien on improved real estate, said Elks property being encumbered, as of the time of the trust investment, with a $3,200 lien for an unpaid municipal tax assessment. *Page 417 
Defendant denies that it violated any of its duties as trustee under the Baker deed of trust and alleges that the four trust investments which complainants now seek to have replaced by cash were each made in accordance with the terms of the trust agreement. Defendant further alleges that the fee of $7,000 it received as trustee under the Chalfonte Hotel indenture of mortgage or deed of trust was perfectly proper and that its acceptance was in accord with the usual practice followed by corporate fiduciaries for acting in such capacity. In defense to all causes of action as set forth in the bill, defendant alleges (1) none of the complainants have suffered any loss as a result of the investments complained of; (2) testatrix, in her lifetime, was well informed regarding these investments and approved of them; (3) there is no privity between complainants and the defendant which imposes upon defendant any duty towards complainants concerning the matters set forth in the bill of complaint and therefore complainants have no standing to maintain their bill.
Complainants moved to strike defendant's answer to the fourth cause of action relative to the Elks mortgage participation certificate investment, but this motion was ordered held over until final hearing, at the outset of which defendant raised the question as to the standing of complainants to maintain their bill. Although this latter issue might seasonably have been disposed of on motion to strike the bill before answer was filed, leave was given defendant to submit proofs in support of its argument.
The proofs disclose that testatrix received from the defendant periodic income statements of the trust account until her death. During this time she never challenged the propriety of the investments. She knew that default occurred in the investments in 1933 and that interest rates were reduced due to prevailing market conditions, but still she continued to accept, without complaint, whatever income was earned and paid over to her. Mr. John Annis, who was the president of Camden Safe Deposit and Trust Company when the investments were made, testified that Mrs. Baker's visits to his office were always "most cordial." Upon her death, Frederick Gerke assumed his duties as executor of her estate. He likewise *Page 418 
received income statements showing the status of the trust account and accepted whatever payments of income were made thereunder. As executor, he, too, failed to challenge the propriety or validity of the trust investments. He inventoried the Elks mortgage participation certificate at its face value of $1,000, but inventoried the three $1,000 Leeds-Lippincott Company bonds at $1,650. No exceptions were filed to the executor's first account, and on October 18th, 1935, the final accounting of the assets of the estate of Letitia J. Baker, deceased, was allowed by the Camden County Orphans Court. By way of making distribution of the assets of the estate, Frederick Gerke, as executor, "assigned" the four trust investments to the residuary legatees of the Baker will. Shortly thereafter defendant was served with a copy of this "assignment" and was notified by mail that the said residuary legatees had appointed Frederick Gerke as their agent to receive all funds to become due from the trust estate owned by testatrix and was authorized "to make any and all payments to him" (Frederick Gerke) "when the same is, and as it is, liquidated, which we hope will be in the very near future." In accordance with this arrangement, all subsequent income statements and remittances of income for the next four years were sent to and received by Frederick Gerke, as agent for the complainants. An income remittance by check, dated January 22d 1940, and in the sum of $69.44, was not accepted by Gerke and was returned to the defendant, the bill of complaint in this cause having meanwhile been filed.
The defendant contends that its duty to the settlor, her personal representative and the cestuis que trust arose under, and is defined by, the terms of the trust agreement. Assuming, without deciding, that there was such a breach of the terms of the trust that a cause of action arose in favor of the settlor, it must necessarily follow, then, that such action, not having been pursued by the settlor in her lifetime, if it survived her, survived to the executor of her estate. Buchanan v. Buchanan,75 N.J. Eq. 274; Kocher's Decedents Estates (2d ed.) 81 §43.
But Frederick Gerke as executor never brought action against the defendant, nor is there any showing that complainants, *Page 419 
as beneficiaries under the trust, ever requested him so to do. The rule is stated by our Court of Errors and Appeals, inBuchanan v. Buchanan, supra, as follows:
"Heirs, next of kin and creditors cannot, in their own names, prosecute actions at law or suits in equity to recover the unadministered estate of a decedent or to collect debts or other choses in action due him. Such suits can be maintained only by the qualified personal representatives of the deceased. * * *" (At p. 276.)
"On the same principle that permits a cestui que trust to maintain actions which his trustee should bring when the latter neglects or refuses to bring them, the exception to the rule above stated arises when, although there is an administrator, he neglects or refuses to prosecute suits for the recovery of his decedent's estate. In such a case, the next of kin may sue to recover the property, joining the personal representative as a party defendant." (At p. 281.)
It therefore appears that the defendant's point is well taken and that complainants have no standing as cestuis que trust of the Baker trust, to challenge the validity of the trust investments in their present bill, to which the executor is not a party. For a period of over five years the settlor knew the details of, and acquiesced in, the investments in question, so that she was effectively estopped to complain thereof.Rothenberg v. Franklin Washington Trust Co., 127 N.J. Eq. 406.
Since she had no cause of action at the time of her death, none could arise in favor of her executor. And in such circumstances it is obvious that the legatees, complainants herein, having had nothing whatever to do with a transaction as to which their testator had by her conduct estopped herself, have no basis for the acquisition of a cause of action against the defendant.
But there are other reasons why complainants are not entitled to relief and these go to the merits of the case. They are in answer to the principal question of whether or not the four investments were proper and valid as trust investments.
As to the investment, on July 1st, 1930, in two $1,000 Leeds and Lippincott Company bonds, complainants claim that defendantipso facto violated fiduciary duties owed the *Page 420 
Baker trust because at the same time it purchased for itself and in its own name a block of 497 similar bonds. But defendant denies that it bought these bonds for its own personal investment but asserts, rather, that the bonds were purchased solely as a temporary convenience to defendant's numerous trust estates. But assuming, without deciding, that defendant purchased this block of 497 bonds for personal investment purposes, can it be said that it thereby violated any fiduciary duty under the Baker deed of trust, that it was guilty of improper conduct and bad faith? It would appear to me that all the stronger evidence of faith in an investment is shown when a fiduciary risks his own funds in the same securities as those he purchases for his trust account. If complainants' argument proceeds upon the theory that the defendant having made both purchases, may some time later be confronted with a falling market when he must choose between disposing of his own securities or those of his trust, still the original purchase and acquisition for the trust are not to be judged by that possibility or even by that eventuality if it occurs. Condemnation of the trustee, if any, is then to be predicated upon his conduct and good faith in his disposition or non-disposition of the respective securities, rather than upon his having acquired them in the first place. The theory of the complainants cannot be accepted because, if it were, no trustee could buy for his trustee any securities if he bought some of the same for himself individually. Thus a corporate trustee such as the defendant could not buy United States or municipal bonds for its trust estate if, at the same time, it had in its separate corporate portfolio bonds of the same issue. To merely state complainants' contention in this respect is to demonstrate its unsoundness.
But the proofs indicate that defendant did not purchase this large block of bonds for its own private investment. The total investment of $2,500,000 in Leeds-Lippincott Company bonds on July 1st, 1930, was made in line with defendant's policy of favoring participation certificates and bonds secured by mortgage or deed of trust because of the prevailing scarcity in that year, and for some few years preceding, of single, straight mortgages for small trust investments. On that date, *Page 421 
defendant's trust department had $1,500,000 available for investment and this money was used to purchase 1,500 bonds, two of these being allotted to the Baker trust. Outside third parties purchased 503 bonds for $503,000, and the remaining 497 bonds were taken up by the defendant with $497,000 of its own funds. No rule governing the conduct of corporate fiduciaries was violated when defendant advanced its own money as a temporary convenience to its trust estates. Obviously, available trust funds for investment come at irregular intervals and in varying sums, and it does not seem that defendant could be found guilty of self-dealing because it advanced its money to effectuate the total investment and to insure its availability as a source of investment pending clearance by the coming in of adequate trust moneys.
In 2 Scott on Trusts 949, the rule is stated as follows:
"Where, however, the trustee is a bank it is not uncommon practice for the bank to take a mortgage, advancing its own money and subsequently allocating shares of the mortgage to the trusts which it is administering. It would seem, however, that if the mortgages were properly secured when the bank advances the money and also when it allocates the shares to the trusts, and where only a short interval elapses between the purchase and the allocation, there is no such self-dealing as to make the transaction improper. In substance, the trustee is not purchasing property for itself individually and later selling it to the trusts. It is merely for convenience advancing its own funds in order to effectuate the investment for the trusts. Hence, it is held that the bank is not liable merely because the security later becomes insufficient."
In In re Dalsimer's Estate, 291 N.Y. Supp. 34; affirmed,296 N Y Supp. 209; affirmed, 277 N.Y. 717, a corporate trustee had advanced its own money temporarily to finance a mortgage loan and subsequently reimbursed itself by allocating participation certificates in the mortgage to various of its trust estates. In refusing to surcharge the trustee on the ground of alleged self-dealing, the court said:
"The proof in these proceedings establishes that the trustee made these advances and original mortgage purchases merely as a convenience in its trust administrations and held its investment in a suspense account pending clearance by the coming in of adequate trust moneys. So the court holds that *Page 422 
the temporary employment by the trustee of its private corporate funds in acquiring the mortgage here criticised brought into effect no different or greater liability than if the trustee had waited until accumulated trust funds had sufficed for the purpose."
The trustee was surcharged in that case, but on other grounds. See, also, First National Bank of Birmingham v. Basham
(Ala.), 191 So. Rep. 873.
As to the investment on October 23d 1930, in another Leeds-Lippincott Company bond, it cannot be successfully claimed that this was in the nature of a sale of defendant's individual property to itself as trustee. It is admittedly true that the bond in question was one of the 497 bonds which defendant bought earlier in the year in its individual capacity, but, as already explained, defendant has shown that its purchase of the 497 bonds was made in accordance with the usual banking practice of initially advancing its private funds to effectuate the loan and later allocating participating shares in its trust estate.
The transfer of one of these bonds to the Baker trust did not amount to a sale of the bond by the defendant individually to itself as trustee, but rather amounted to an allocation of this security from one account to another. It was for the purpose of later allocating these 497 bonds to various trust accounts that defendant acquired them in the first place and by allocating one of them to the Baker trust it did not become guilty of any self-dealing such as to make the transaction improper. 2 Scotton Trusts 882 § 170.14 and p. 949 § 179.4.
As to the fee of $7,000 which defendant received as compensation for its services as trustee under the Chalfonte Hotel mortgage which secured the $2,500,000 Leeds-Lippincott Company bond issue, I cannot see that its receipt has offended any rule governing the conduct of a corporate fiduciary. Complainants' contention that this fee was in the nature of a bonus or commission for promoting or underwriting the bond issue is untenable. Nor is it shown that the choice of defendant as the indenture trustee depended on its purchase of the entire issue for itself and its many trust estates, or that the investment of funds of the Baker estate in three of these *Page 423 
bonds benefited defendant-trustee individually, even though it happened to be the indenture trustee. The fee was to compensate defendant for its services as trustee in holding the security for the bond issue over the ten years it had to run, supervising the payment and collection of interest twice a year on these 2,500 bonds, looking after tax payments and insurance on the mortgaged premises, c. The fee is not to be condemned as excessive or as an unwarranted lure for bringing about the investment of trust funds which would not otherwise have been forthcoming when it is considered that this fee amounted to but $700 per year and that defendant was required to handle yearly 5,000 interest coupons alone, even if it rendered no other service. It seems ridiculous to assume that because the defendant, accustomed to serving as an indenture trustee, became such trustee under a large bond issue it would be prevented from purchasing some of those bonds for its trust account, if, for acting as indenture trustee, it received a service fee. It is entirely clear that with respect to large issues of bonds, such as the Leeds-Lippincott Company bonds, only a large trust company could act as trustee for the bondholders and it cannot justly be maintained that the trust company is not to be paid for its services as such fiduciary. In this case, the bondholdings of the Baker trust were in nowise jeoparded by the fact that the defendant, in another trust capacity, held the security behind those bonds.
A close approach to the foregoing is to be found in the recent case of In re Haston's Estate, 331 Pa. 507; 1 Atl. Rep. 2d292, in which the Supreme Court of Pennsylvania dealt with the matter of similar objection being made to a trustee acting as rental agent for the mortgagor of a mortgage in which participation certificates had been allotted to various trust estates being handled by the trustee. In that case, the trustee was also a trust company which took over a mortgage in which it allotted participation certificates to certain of the trust estates it was administering. At the same time, it undertook the task of acting as rental agent for the mortgagor and on rentals collected received a five per cent. rental commission which was deducted from distributions of income to the participating estates. In holding that the receipt of these commissions was proper, the court said: *Page 424 
"The compensation received by the trustee as rental agent for the owner was not money which the participating trust interests would otherwise be entitled to. They would have belonged to the owner, or would have been paid out to some other rental agent as fair compensation for services rendered. It was not shown that the rental commissions were in any sense a profit; on the contrary, they were just charges for services performed by accountant in its required administration of the trust, and their receipt does not offend the admitted rule against a trustee's obtaining a bonus or commission from dealings with specific trust property, as commented upon in American Law Institute,Restatement of Trusts 438 and 549 §§ 170 and 293."
Finally, objection is made to the investment of trust funds in the participation certificate of the Elks mortgage on the ground that, when the investment was made, the premises covered by the mortgage were encumbered by a municipal lien for an unpaid tax assessment. Complainants contend that defendant breached its statutory and common law duties as a trustee in making the investment. It is true that R.S. 3:16-2 et seq. provide that a trust investment represented by a participation certificate should be a first lien on improved real estate, but, by the very terms of the Baker trust agreement, this statutory restriction is eliminated. The trust agreement explicitly authorizes defendant to invest trust funds in those securities which it deems advisable "whether the same be those securities which are authorized for the investment of trust funds by the laws of the State of New Jersey or otherwise." Not being bound by statute, the defendant cannot be found guilty of having violated it.
Nor has defendant violated the common law rule that a trustee with a discretionary power to invest trust funds must make only those investments which a prudent man would make. Scott onTrusts § 227.14; Restatement of the Law on Trusts 645 § 227-0.
Would a prudent man have made this investment? It is true that when the investment was made in this mortgage, and even when the mortgage was executed, there was a lien encumbering the premises covered by the mortgage as a result of an unpaid tax assessment for *Page 425 
special improvements assessed against the Elks as their share of the extensive improvements made in the vicinity of their property when Broadway was extended to connect with the Camden approaches to the newly erected Delaware river bridge. The assessment was $3,200, and, together with other property owners in the neighborhood who were likewise assessed, the Elks appealed. When the $200,000 Elks mortgage was placed in 1929, the assessment was shown as an exception in the title policy insuring the mortgage, but the mortgagee, which was the Camden Safe Deposit and Trust Company, advanced the loan on the strength of the mortgagor's promise that this unpaid assessment would be paid if the pending appeal was not decided in its favor. However, it was not until October 25th, 1935, that the hearings were completed and the appeals dismissed, but, by then, the Elks had defaulted in their obligation due to the prevailing economic depression and defendant itself then paid the tax assessment to the city of Camden to protect the participation certificate holders. The investment of $1,000 of Baker trust funds in this $200,000 mortgage was not imprudent at the time the investment was made. The mortgage covered a valuable city corner lot upon which the Elks had just erected a $350,000 building. In 1928 the Elks had an income from dues, restaurant, bar, billiards and bowling, of about $97,000. In 1929 they had a membership of 1,910 with dues of $18 per annum. Income from all sources in 1929 was over $160,000. Compared with these figures the $3,200 tax assessment was small. It is quite natural that, pending appeal, the Elks were unwilling to pay the assessment because of the uncertainty as to the amount which would be due. Defendant's reliance on a positive assurance, in 1926, that the Elks would pay the assessment if their appeal was dismissed cannot be said to have been imprudent, or improper, under the circumstances.
 I shall advise a decree in accordance with these conclusions. *Page 426