In the Matter of the Estate of CLARA ELIZABETH VON HATZFELDT WILDENBURG, Deceased.

Surrogate's Court, New York County, July 5, 1941.

*McLaughlin, Russell & Bullock* [*Frederick C. McLaughlin* and *Ralph A. Bullock* of counsel], for the objectants.

*Larkin, Rathbone & Perry* [*Albert B. Maginnes* and *Leonard A. Blue* of counsel], for Central Hanover Bank & Trust Company, trustee.

FOLEY, S. Certain triable issues raised by objections filed to the account of the trustee in this proceeding were referred to a referee

to hear and determine. The referee has filed his report determining the issues in favor of the trustee and overruling the objections. A motion has been made to overrule his report. The motion is denied and the report of the referee is confirmed in its entirety.

The trust estate, which is the subject-matter of the accounting by the trustee, was created by the will of the testatrix, known as the Princess Clara Huntington Hatzfeldt, for the benefit of Philip Champion de Crespigny, late commander in the British Navy. The fund was originally part of the principal of a trust created under the will of the father of the testatrix, with the income payable to the princess during her life and with power to appoint the remainder by her will in the event of her death without issue. She died leaving no issue. She exercised the power in favor of Commander de Crespigny by directing the delivery of the sum of $250,000 to the trustee herein, with directions to pay the income to him during his life. Upon his death, she directed that the fund be paid over " in trust for such person or persons for such purposes and in such manner as the said Philip Champion de Crespigny shall by will or codicil appoint and in default of and subject to any such appointment I direct that the said investments and income shall fall into and be dealt with as part of my residuary estate."

Commander de Crespigny died in 1939 a resident of England. He left a will in which he exercised the power of appointment granted him by the testatrix here. The validity of the exercise of the power of appointment by the testatrix under her father's will and the legality of the secondary power of appointment conferred by her upon Commander de Crespigny were the subject of construction and were sustained by me in my prior decision in this estate (reported in 174 Misc. 503). I held that the fund passed to Valentia Lancaster and Claude Raul Champion de Crespigny, as the sole residuary legatees under the will of Commander de Crespigny, subject only to the collection and distribution to such beneficiaries by the executors and trustees appointed under his will.

Objections to the account were first filed by the English executors and trustees under the will of Commander de Crespigny and subsequently, upon his appointment by this court, by the ancillary executor of his estate. Certain of the objections were withdrawn before the referee. The remaining objections deal with the validity and propriety of the investments made by the trustee on two mortgage participations and in certain preferred stocks of American corporations.

The trustee's powers as to investments are contained in article 11 of the will of the testatrix which reads as follows:

" 11. And I direct that any moneys requiring investment for the purpose of this my Will may be invested by my Trustees in any of the public stocks or funds or Government securities of the United States of America or the United Kingdom or in or upon freehold copyhold leasehold or chattel real securities in Great Britain (but not in Ireland or Egypt or India) or in or upon the security of any real or immovable property in the United States of America or in or upon the bonds debentures debenture stock mortgages obligations or securities or the guaranteed preference or guaranteed ordinary stock or shares of any Company or public municipal or local body or authority in the United Kingdom or the United States of America."

The first objection relates to an investment in a participation in a bond and mortgage upon an unimproved plot in the real estate development in the city of New York, commonly known as Tudor City. The referee has carefully analyzed the circumstances surrounding the making of this investment and reports as follows: On December 1, 1930, the Central Hanover Bank and Trust Company, which is the accounting trustee herein, purchased from the New York Title and Mortgage Company a consolidated mortgage of $700,000 covering premises 226–254 East Forty-first street, 315–329 East Fortieth street and 2–14 Prospect place, in the borough of Manhattan, New York city. On December 5, 1930, the trust company, as trustee, invested $15,000 of the trust funds in a participation in the bond and mortgage. The real estate covered by the bond and mortgage was unimproved. It contained tennis and hand ball courts from which very small revenue was obtained. It was part of the Tudor City enterprise commenced several years prior to 1930 which included very large apartment houses successfully operated. The mortgage contained a prepayment clause. The land was intended for further development of the Tudor City project. It was regarded as one of the most desirable parcels of real estate in the city of New York. It had been appraised by Louis B. Altreuter, of Horace S. Ely & Company, at $1,400,000. It was assessed in 1930 for $1,045,000. The value of the real estate as appraised was 100 per cent more than the amount of the mortgage. It further appears that accompanying the mortgage purchased by the trust company was a bond made by the 11th Tudor City Unit, Inc. The trust company also obtained a collateral bond of the Fred F. French Investing Company, the parent company which promoted Tudor City and other real estate improvements in the borough of Manhattan. Payment of the principal and interest on the bond and mortgage was guaranteed by the New York Title and Mortgage Company. The Fred F.

French Investing Company has never defaulted in the payment of taxes which ranged from $20,000 to $30,000 per annum. Interest at the mortgage rate of five and one-half per cent was paid until 1934. Since that year it has been paid at reduced rates. No testimony was offered by the objectants tending to show that the real estate was not equal to the appraised value fixed at the time the investment was made by the trustee and it is apparently conceded that the property was worth that amount.

The objectants have attacked the propriety of this investment and seek a surcharge against the trustee on the ground that in making it the trustee failed to exercise the prudence, foresight and vigilance which the law required. The referee has found that the investment was made prudently and in good faith and overruled the objection. I am entirely in accord with the referee's conclusion. The will of the testatrix specifically directed that the trust funds of her estate may be invested, " in or upon the security of any real or immovable property in the United States of America." It is not claimed on behalf of the objectants that any limitation was imposed by the provisions of the will upon investments in bonds and mortgages upon real property which had not been improved. Nor is it contended that an investment upon the security of an unimproved parcel of real estate did not come within the class of investments authorized as legal and proper for trust funds under section 111 of the Decedent Estate Law and section 21 of the Personal Property Law. The provisions of the latter statutes are identical and authorize investments by a trustee " in bonds and mortgages on unencumbered real property in this State worth fifty per centum more than the amount loaned thereon." Counsel for the objectants claim, however, that the participation was an imprudent and improper investment, although of a type made legal by statute, and that reliance upon the guaranty of the New York Title and Mortgage Company did not clear the trustee of liability. If the charge of imprudence and impropriety is based upon the fact that the property was unimproved at the date of the purchase of the participation, it is without merit, since the investment was not forbidden either by the terms of the will nor by the provisions of law. Moreover, I hold that the trustee acted with reasonable care and prudence in relying upon the additional security of the guaranty of payment of principal and income of the mortgage by the New York Title and Mortgage Company. (*Mills* v. *Bluestein*, 275 N. Y. 317; *Matter of Smith*, 279 id. 479.)

In *Mills* v. *Bluestein* (*supra*) there was involved the legality of the investment of funds deposited with the city chamberlain of the city of New York to the credit of an infant, in a guaranteed

mortgage certificate directed to be made under the order requiring the deposit. The certificate represented an undivided interest in a bond and mortgage issued by the State Title and Mortgage Company, a corporation subject to the supervision of the Insurance Department of the State of New York. In its certificate the company guaranteed payment of principal and interest. It represented that " the share in [the] bond and mortgage constitutes a legal investment for trust funds under the laws of the State of New York." The bond and mortgage, in fact, were found by the Court of Appeals not to be a legal investment because the property was not worth more than fifty per centum of the amount of the loan. Though not a legal investment under the statute, the court, nevertheless, decided that there could be no recovery by the infant for any loss sustained since there was no evidence of negligence or wrong by the city chamberlain who relied upon the aforesaid guaranty. Judge LEHMAN, now Chief Judge of the Court of Appeals, there wrote:

" It is said that here the custodian in acting upon the assurance of the guarantor exercised no care himself. A trustee or a custodian with duties analogous to a trustee may not delegate to another an exercise of discretion which is part of his own duty; but reliance upon the assurance of the guarantor was not a disregard or delegation of duty by the Chamberlain. The City Chamberlain could hardly be expected to search the title or appraise the value of every parcel of real estate subject to a mortgage in which court funds are invested. To do so in person would be a physical impossibility and he has no staff of deputies who can do so in his place. All that can be required of him is to make such investigation and to obtain such information as would under the circumstances seem sufficient to a reasonably prudent investor. Since the City Chamberlain could not in person investigate the title or value of the mortgaged premises, action based upon a report or assurance of another is not a delegation of duties or powers. It is indeed the only way in which his powers could be intelligently exercised and reliance upon such assurance or report is not negligence if it comes from a source upon which reliance would be placed by a man of prudence.

" The assurance here came from the guarantor. The company was subject to the supervision of the Insurance Department and to all the statutes, rules and regulations intended for the protection of those who relied upon the guaranty or assurance of such a corporation. The company was in good standing. It was permitted by the Department of Insurance to sell guaranteed certificates to investors with the representation that they were

legal investment for trust funds. An investor might reasonably assume that such representation was made in good faith and after proper investigation. Indeed, the purpose of the representation was to induce investors to act upon it. Loss caused by error in valuation of the mortgaged premises would fall upon the guarantor under its guaranty."

In *Matter of Smith* (*supra*) the committee of an incompetent war veteran invested certain disability payments received from the United States Veterans Bureau in participations in mortgages upon real property in the boroughs of Manhattan and Queens. The investments were made pursuant to orders of the Supreme Court which authorized the committee to invest " in securities that are legal for trust funds, paying not less than $5\frac{1}{2}\%$." The certificates of participation were selected by the committee upon the advice of an attorney of the Veterans Administration or of a representative of the American Legion to whom the attorney referred the committee and who was requested to assist the committee in the purchase of a legal investment proper for trust funds. The investment was attacked as unauthorized and improper. Again Judge LEHMAN, writing for the court, after upholding the authority of the committee to invest in certificates of participation of bonds and mortgages, said: " The committee's investment is challenged in this case also on the ground that the mortgaged properties were incumbered by tax liens and were not worth fifty per centum more than the loans. Only a title search and an appraisal of the mortgaged premises would have disclosed such infirmities in the investment. A fiduciary may not escape liability for investments in securities of a *type* not sanctioned by the statute, regardless of whether he used care and judgment in his choice. He acts at his peril when he disregards statutory limitations upon his power. (*Delafield* v. *Barret*, 270 N. Y. 43, 48, 49.) He may not, however, be charged with wrong and liability for consequent damage, when in spite of the exercise of care and prudence he fails to discover extraneous facts which render a particular investment — though of a type sanctioned by the statute — unsafe and improper for trust funds. In this case the committee appears to have used the care and prudence which a reasonably careful committee would, under the circumstances, have used." (Citing *Mills* v. *Bluestein*, 275 N. Y. 317.)

Dependence upon the " advice of those to whom she might reasonably look for advice " was there held sufficient to relieve the committee from liability.

Nor can the trustee here be condemned for accepting as the fair value of the real estate, the appraisal made by a member of a reputable firm of real estate appraisers, familiar with the worth

of property in the locality in which the real estate was situated. Careful and prudent business men, for their own ascertainment of values and the advisability of investing, depend generally upon the expert opinion of those professionally engaged in the appraisal of real estate. Moreover, the desirable location of the real property in Tudor City, the accompanying bond of the 11th Tudor City Unit, Inc., the collateral bond of the Fred F. French Investing Company and the conditions at the time of the investment were further factors which the trustee, as a prudent investor, was justified in taking into consideration when making the investment. They meet the test of prudence laid down in *King* v. *Talbot* (40 N. Y. 76) and *Costello* v. *Costello* (209 id. 252).

To support their attempted surcharge, great stress is laid by counsel for the objectants upon *Matter of Dalsimer* (160 Misc. 906; affd., 251 App. Div. 385; affd., 277 N. Y. 717). In that case the Appellate Division affirmed on the ground that, under all the facts and circumstances there disclosed, the trustee was under a duty to make inquiry before allocating funds of the trust to the mortgage and that such inquiry would have shown the mortgage was then unsuitable. as an investment for trust funds. Counsels' attempt to extend the facts of that estate to the situation here is unjustified. They are not applicable.

There is not the slightest evidence in the record here of lack of care, prudence or vigilance on the part of the trustee in making this investment, and it may not be surcharged for any loss sustained due to economic conditions beyond its control.

The second objection relates to an investment made by the trustee in a participation in a bond and mortgage upon a parcel of real estate in the development known as London Terrace, in this city. As in the case of the Tudor City investment, the learned referee has made a detailed analysis of the testimony relating to the conditions and circumstances which lead to the making of this investment by the trustee. It appears from his report that on September 26, 1930, the trustee purchased from a subsidiary of the New York Title and Trust Company a guaranteed mortgage on premises known as 455 West Twenty-third street and 460 West Twenty-fourth street, in the borough of Manhattan, New York city. The property was one unit of the buildings known as London Terrace. It consisted of an apartment house fronting on West Twenty-third street and another apartment house fronting on West Twenty-fourth street, with a landscape garden separating the two buildings. The mortgage was in the sum of $1,100,000 and the share apportioned to the trust in this estate was in the sum of $10,000. London Terrace is an improvement of the entire city block between Ninth

and Tenth avenues and between Twenty-third and Twenty-fourth streets. One large unit comprised of stores and apartments embraces the entire frontage on Ninth avenue and a similar building, the frontage on Tenth avenue. Between the two large avenue units are five separate units, all identical with the unit upon which the mortgage here under consideration was placed. It was a modern improvement with facilities for 1,700 tenants. Each unit, however, was a separate entity and was capable of operation under separate management.

In the year 1929, Mr. Louis Altreuter, one of the most experienced real estate experts in Manhattan, appraised the property here in question at $1,650,000. On September 26, 1930, he appraised an adjoining unit at the same figure. The units were identical, and the Central Hanover Bank and Trust Company loaned $1,100,000 on each unit. Two mortgage loans in the same amounts on identical units were made at the same time by the New York Life Insurance Company. Also at the same time the Bowery Savings Bank loaned $1,100,000 on a similar unit. The placing of the mortgage was handled through the manager of the mortgage department and the vice-president in charge of the personal trust department of the Central Hanover Bank and Trust Company. Before passing upon the loan the trustee requested another appraisal by Cruikshank Co. The latter company also appraised the property at a value of $1,650,000. The loan was made as a result of an inspection of the property as well as upon the appraisals. When the mortgage was purchased by the trust company in September, 1930, the unit upon which it was placed was eighty per cent rented and at the time that the $10,000 of the funds of this estate were invested in the participation, the property was ninety-five per cent to one hundred per cent rented. The mortgage was guaranteed by the New York Title and Guaranty Company. Interest was paid at the full rate of five and one-half per cent until October 1, 1932, and since then interest has been paid at approximately four per cent. There has never been any default in the payment of taxes. An installment payment of two per cent on the principal became due on October 1, 1932, but neither this nor any subsequent installment of principal has been paid.

The investment was challenged by the objectants on the ground that the property was unsuitable for trust investments because it was highly speculative, that the valuations relied upon did not exist and that it was not of the type permitted to trustees by law.

The referee has accepted the valuation placed upon the real property by the witnesses who testified on behalf of the trustee as a basis for finding that the property was not overvalued and rejected

the testimony of the witnesses produced by the objectants. He has held that the evidence before him was "entirely insufficient to justify a finding that two of the leading real estate experts and four recognized financial institutions were wrong and imprudent in placing a valuation on this and similar properties of $1,650,000." He overruled the contention of the objectants that each of the units constituting London Terrace was not capable of separate operation and accepted the opinion expressed by the trustee's witness that each unit could be successful if operated separately, instead of in conjunction with the other units in the block. Finally, the referee has found that the trustee acted in good faith and with reasonable care and without personal gain and that the investment in the London Terrace mortgage was prudently made. He correctly held that the trustee cannot be held liable for mere error of judgment, nor surcharged for a shrinkage in value of the real estate due to the economic conditions, all of which took place after the investment was made. (*Matter of Smith, supra; Matter of Doelger*, 279 N. Y. 646; *Matter of Pinney*, 278 id. 507; *Mills* v. *Bluestein, supra; Chemical Bank & Trust Co.* v. *Ott*, 274 N. Y. 572; *Matter of Clark*, 257 id. 132; *Matter of Kramer*, 172 Misc. 598.)

The surrogate sustains the findings of the referee in every respect for the reasons and upon the authorities heretofore cited with respect to the Tudor City investment. The referee was justified in holding that the trustee could rely upon the guaranty of the payment of the principal and interest of the mortgage. The referee has correctly applied the authorities to the facts here. Indeed, he was unusually well qualified and competent to pass upon the objections raised. He has had special experience upon the trial of issues involving investments in mortgage participations where surcharges were sought. He had the opportunity of hearing the testimony and observing the witnesses produced on behalf of the parties as to the circumstances leading up to the placement of the mortgage and the value and condition of the property in 1930. "To the sophistication and sagacity of the trial judge the law confides the duty of appraisal." (*Boyd* v. *Boyd*, 252 N. Y. 422, 429.) "Where truth hangs upon the credibility of witnesses, courts should consider the advantages of the trial court who has seen and heard the witnesses." (*Smith* v. *Smith*, 273 N. Y. 380, 383; *Boyd* v. *Boyd, supra*.) "These observations apply with equal force to the determination of an experienced referee." (*Matter of Kramer, supra*, citing *Nottingham* v. *Nottingham, No. 1*, 209 App. Div. 459.)

The remaining objections which the referee was required to consider relate to the purchase by the trustee as investments of 300

shares of the preferred stock of the Commonwealth and Southern Corporation, 300 shares of the preferred stock of the Baltimore and Ohio Railroad Company and 83 shares of the preferred stock of the Philadelphia Company. The ground of the objections as to each of the foregoing issues of stock is that they were unauthorized by the terms of the will. The objectants contend that the trustee was restricted by article 11 of the will to " guaranteed preference or guaranteed ordinary stock or shares of any Company " and that the word " securities," as used by the testatrix, referred to securities which were in the nature of bonds or debentures and not preferred or common stock. Article 11, so far as pertinent, reads as follows:

" And I direct that any moneys requiring investment for the purpose of this my Will may be invested by my Trustees * * * or in or upon the bonds debentures debenture stock mortgages obligations or securities or the guaranteed preference or guaranteed ordinary stock or shares of any Company or public municipal or local body or authority in the United Kingdom or the United States of America."

At the outset, in their attempt to overrule the findings and conclusions of the referee, counsel for the objectants speciously submit to the surrogate that since the testatrix's will was drafted by English solicitors and refers throughout to an English estate and an American estate with separate executors and trustees as to each, article 11 of the will limits both the English and American executors and trustees to specified types of investments which have a fixed meaning in English law and practice. This argument is without the slightest justification. They have entirely disregarded or perhaps completely overlooked the provisions of article 19 of the will wherein the testatrix expressly declared " that the rights and interests of all beneficiaries under this my Will shall be governed and determined by and in accordance with the law of the State of New York, the United States of America, and that this will shall be construed and take effect in accordance with the law of said State of New York this Will being drawn in accordance with the said Law."

Counsel for the objectants further urge that the *ejusdem generis* rule should be applied here. They argue that since the word " securities " is followed immediately by the words " or guaranteed preference or guaranteed ordinary stock or shares of any Company," the testatrix intended to limit investments to securities of that kind or nature. Their argument is not in the least persuasive. The referee has overruled it. His ruling is sustained by the surrogate.

In the first place it should be noted that not a single comma or other mark of punctuation is used by the testatrix in the entire

clause to set off one word from the other. The will gives the trustee the widest grant of power and discretion as to investments. Within the enumerated class almost every kind of security was authorized. There is nothing in the will to indicate that the testatrix used the word " securities " in any other sense than its ordinary and natural one. To limit the word, therefore, to a particular kind of security is entirely inconsistent with the broad grant of power and discretion indicated. I hold that the testatrix intended to include as proper investments of the funds of the trust, in addition to those securities specifically mentioned in her will, common or preferred shares of stock which were not guaranteed or secured. (*Rosenthal* v. *Brown*, 247 N. Y. 479; *Irving Trust Co.* v. *Natica*, 157 Misc. 32; *Matter of Loose*, 167 id. 764; *Matter of Vanderbilt*, 132 id. 150; *Estate of Myers*, N. Y. L. J. Nov. 6, 1940, p. 1426.) She must be deemed to have employed the word " securities " in the vocabulary of ordinary life and not in any technical or narrow sense. (*Matter of Vanderbilt, supra.*)

In *Matter of Vanderbilt* (*supra*) I pointed out: " In the general usage of speech employed by men of business affairs, the word ' securities ' is used in its widest sense to describe the broad class of financial investments. As so employed it imports the inclusion of stocks — common and preferred — as well as secured investments. (See 25 Am. & Eng. Ency. of Law [2d ed.], 180; *Will of Stark*, 149 Wis. 631.) The Century Dictionary defines ' security ' as ' evidence of debt or of property, as a bond or a certificate of stock.' Under the mandate of the will the trustees, therefore, properly included shares of stock in the trust."

Such usage is further supported by the various references to the words " stocks," " shares," " bonds " or " securities," in other articles of the will.

In article 9 the testatrix specifically authorized her American executors and trustees to retain, as long as they may think fit, any portion of her estate which consists of " stock shares bonds securities or other personal property." In article 15 she declared it lawful for her trustees under any reorganization scheme or otherwise to pay out of the capital or income of her estate any call or calls upon any " shares " which she may at the time of her decease hold or be entitled to in any railway or other company and also to accept or refuse any " new shares or stock " in any such railway or other company which may be allotted to them in respect of any " shares or stock " belonging to her therein. The trustees were further authorized to make advances from capital or income for the protection of any " bonds stock shares and any other investments " held by them in case of foreclosure of mortgages or other-

wise. Again, in article 17, reference is made by the testatrix to "bonds, stocks, shares, securities or investments the property or assets of my estate." Clearly the use of the words "bonds," "stocks," "shares," "securities," or "investments," indicates that she was not using the word "securities" in any technical or restricted sense. Moreover, if any restricted meaning is to be given to the word "securities" in article 11, it becomes mere surplusage because it is immediately preceded by the word "obligation" which in a broader sense includes securities of every kind and nature.

The referee has sustained the investments in the preferred stocks, to which objections have been filed, as authorized within the meaning of the will. Entirely aside from this determination the referee has found that even if the investments were made in violation of article 11 of the will, the trustee could not be surcharged for any loss because Commander de Crespigny, the life beneficiary of the trust and the donee of the power under the will of the testatrix, expressly approved of the investments during his lifetime. There is in evidence as an exhibit a letter from the commander, received June 16, 1930, advising the trustee of the approval of the investments in 200 shares, Baltimore and Ohio Railroad, preferred stock, 200 shares, Commonwealth and Southern Corporation, preferred stock, and 100 shares, Philadelphia Company, preferred stock. It was stipulated upon the trial that he also approved of an additional investment of 100 shares, Baltimore and Ohio Railroad, preferred stock, 100 shares, Commonwealth and Southern Corporation, preferred stock. In the letter he specifically described the investments as "Preferred Stock." His information concerning the investments was obtained from the solicitors for the English executors. Commander de Crespigny was one of the English executors of the will of the testatrix. The referee held that by force of that letter the commander was estopped at a later date from questioning the validity of the investments. (*Butterfield* v. *Cowing*, 112 N. Y. 486; *Woodbridge* v. *Bockes*, 59 App. Div. 503; affd., 170 N. Y. 596; *Matter of Kern*, 159 Misc. 682; *Matter of Turner*, 156 id. 68; *Matter of Packard*, 146 id. 65; *Matter of Chaves*, 143 id. 868.) In *Butterfield* v. *Cowing* (*supra*) the Court of Appeals said: "It is quite clear that no *cestui que trust* can allege that to be a breach of trust which has been done under his own sanction, whether by previous consent or subsequent ratification. The general rule is that, either concurrence in the act, or acquiescence without original concurrence, will release the trustees."

It does not appear that any claim of fraud or imposition alleged to have been practiced upon the commander in the execution

of the instrument has been made. No proof of any misrepresentation by the trustee or of refusal to disclose any fact was offered. He must be presumed to have known the contents of the letter when he attached his signature to it and was bound by his act. (*Matter of Schoenewerg*, 277 N. Y 424; *Matter of Stone*, 272 id. 121.) The question is, therefore, presented, are the appointees under his will also estopped from challenging the propriety of the investments?

It should be restated that had Commander de Crespigny not exercised the power of appointment conferred upon him, by appointing in favor of the appointees represented by the objectants, the remainder would have vested in him, as residuary legatee under the will of Princess Hatzfeldt. In the latter event the representatives of his estate would have been bound by his express approval. Certainly no different rule should apply to the appointees under his will. The surrogate is, of course, familiar with the authorities which hold that the power of appointment relates back to the will of the donor of the power and must be tested by the terms of the latter's will. That test, however, is not here involved. The question is one of express consent, acquiescence and estoppel. It would seem that considerations of equity and justice would require that the acts of the donee of a general power of appointment should, so far as is consistent with law and not against public policy, not be permitted to be challenged by those who ultimately find themselves to be the recipients of his generous bounty. While no case squarely in point appears to have been found in this State, similar situations have arisen in the States of Pennsylvania and New Jersey. (*Matter of Curran's Estate*, 312 Penn. St. 416; 167 A. 597; *Matter of Perkins' Trust Estate*, 314 Penn. St. 49; 170 A. 255; and *Brown* v. *Fidelity Union Trust Co.*, 126 N. J. Eq. 406; 9 A. [2d] 311.) In *Matter of Curran's Estate* (*supra*) the court said: " The life tenant, having the general power of appointment, in a sense had complete dominion over the property (*Lyon* v. *Alexander*, 304 Penn. St. 288; 156 A. 84) as she could appoint to her own estate. There is evidence that she was advised by the trustee, as late as 1925, that part of the corpus was in nonlegal investments, and, annually from 1909 to 1930, was furnished with reports, showing income received and distributed, and sales of securities during the period of the report. Certainly if, in the circumstances, with full knowledge of the facts and of her rights, Mrs. Curran [the donee] was content, her appointees will not be heard to complain."

In *Matter of Perkins' Trust Estate* (*supra*) the appointees of a life tenant who had a general power of appointment sought to surcharge the trustees for certain illegal investments which the life

tenant had prevailed upon them to make. The Supreme Court of Pennsylvania there said: "This action to surcharge the trustees with loss of the trust funds is brought after the death of Arthur Clark Denniston [the donee] by his wife and the three persons named above as contingent remaindermen. We will not discuss in detail the investments involved. The auditing judge states as to them: * * * 'These legatees owe their interest, not to the settlor, but to the life tenant through his power of absolute appointment. As he * * * was estopped, so are those who claim through him.' * * * It is 'unfair and unjust to permit a person to induce the making of investments — however unwise — and then to permit him, or any person or persons claiming through or under him, to repudiate such investments and to benefit thereby.' "

In *Brown* v. *Fidelity Union Trust Co.* (*supra*, 440), where a similar situation existed, the life beneficiary of a trust who was the donee of a power of appointment did not avail herself of the right to challenge certain questionable investments as illegal, but acquiesced in their approval upon accountings by the trustees. The court there held that since the life beneficiary did not avail herself of the right to object to the investments, she would, if still living, be estopped to challenge them. "As she would be, so now are her appointees so estopped. An unwise investment by a trustee cannot be repudiated by the person inducing it nor by any one claiming through him."

The reasoning of the courts of Pennsylvania and New Jersey is well founded and sound and should be adopted and followed by the courts of this State.

The findings and conclusions of the referee are sustained in all respects and his report is confirmed.

Submit decree on notice confirming the report and settling the account of the trustee accordingly.